**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**March 24, 2004**

**Charles R. Fulbruge III**
Clerk

REVISED APRIL 12, 2004
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 02-30629

---

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

KELLY DONALD GOULD,

Defendant-Appellee.

---

Appeal from the United States District Court
for the Middle District of Louisiana

---

Before KING, Chief Judge, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DEMOSS, BENAVIDES, STEWART, DENNIS, CLEMENT and PRADO, Circuit Judges.[*]

GARWOOD, Circuit Judge:

In this felon-in-possession prosecution (18 U.S.C. § 922(g)(1)), the Government appeals the district court's granting of the motion to suppress filed by defendant-appellee Kelly Donald

---

[*]Judge Pickering was not a member of the court when this case was submitted to the court en banc and did not participate in the decision.

Gould (Gould).

Louisiana deputy sheriffs, having received on October 17, 2000, a telephone warning that Gould, known to be a convicted felon with a reputation for violence, was planning to kill two local judges, went that same evening to the approximately 14 x 60 foot trailer where Gould lived to talk to him, not then intending to arrest him. The officers, who had neither a search nor an arrest warrant, were admitted by another resident of the trailer, Dennis Cabral, who said Gould was asleep in his bedroom. The officers entered and proceeded down the hall towards the bedroom Cabral had indicated. The bedroom door was open, but the officers did not see Gould, and they then conducted a brief protective sweep for him, looking under the bed and opening the door to each of the two bedroom closets, in one of which they saw in plain view, but did not then seize, three rifles. They promptly then ran outside and later found Gould hiding in the woods. In subsequent questioning Gould stated he was keeping the rifles for their owner, a female acquaintance. Gould was then arrested, executed a consent to search, and the rifles were then seized.

The district court, granting the motion to suppress the weapons, held that although "Cabral had apparent authority to consent to the search of the mobile home . . . he had no apparent authority to consent to a search of the master bedroom." The Government sought to invoke the "protective sweep" doctrine of

2

*Maryland v. Buie*, 110 S.Ct. 1093 (1990). However, the district court, though recognizing that the officers "needed to locate the defendant for their own safety, so they could make sure he did not launch a surprise attack from a hidden location," construed our opinion in *United States v. Wilson*, 36 F.3d 1298, 1306 (5th Cir. 1994), as having "explicitly restricted the use of the 'protective sweep' exception to the warrant requirement to searches incident to arrest," and thus held that "[b]ecause the 'protective sweep' was not conducted as an incident to arrest, however, the search of the closet in the master bedroom was illegal." In denying the government's motion for reconsideration, the district court summarized and confirmed its prior ruling:

> "[T]his court noted the defendant's violent past, and did not dispute that the officers were justified in viewing the defendant as a violent and potentially dangerous individual. Furthermore, the officers' search of the master bedroom did not exceed the acceptable scope of a protective sweep, which extends only to a cursory inspection of those spaces where a person may be found, and lasts no longer than is necessary to dispel the reasonable suspicion of danger. However, this court found that the initial search was illegal, because it did not meet the requirement that a protective sweep must be incident to an arrest."

A panel of this court affirmed. *United States v. Gould*, 326 F.3d 651 (5th Cir. 2003). The panel concluded that it was bound by *Wilson*, the most reasonable reading of which was that it laid down an across-the-board, bright-line rule that, whatever the other circumstances of a particular case might be, the "protective sweep" doctrine was always inapplicable if the sweep was not incident to

3

an arrest. *Gould* at 654-55. The panel, however, suggested the appropriateness of considering en banc "whether this Circuit should adhere to *Wilson*'s *ipso facto* disallowance of all protective sweeps not incident to an arrest." *Id*. at 655, *et seq*. We then voted the case en banc. *United States v. Gould*, 335 F.3d 376 (5th Cir. 2003).

I.

WHETHER A PROTECTIVE SWEEP MUST ALWAYS BE INCIDENT TO AN ARREST

We turn initially to the primary issue now before us, namely whether there is an across-the-board, hard and fast *per se* rule that a protective sweep can be valid only if conducted incident to an arrest. We hold there is not.

We begin, of course, with the Supreme Court's opinion in *Buie*. And that opinion does, indeed, begin with the statement that "[a] 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *Id*. at 1094. But there was no dispute in *Buie* that the sweep was incidental to arrest, and nothing in *Buie* states that if the officers were otherwise lawfully in the defendant's home and faced with a similar danger such a sweep would have been illegal. The *Buie* Court had no occasion to so state as the sweep there was indisputably incident to the arrest. We note that in *United States v. Knights*, 122 S.Ct. 587 (2001), likewise a home search case, the Court describes as "dubious logic" the

4

argument "that an opinion upholding the constitutionality of a particular search implicitly holds unconstitutional any search that is not like it." *Id*. at 590.

We do not suggest that *Buie* did not emphasize the fact of arrest. It indeed did. But it did so *because* the arrest exposed the officers to danger. *Buie* at 1098. However, *Buie* gives no indication that circumstances other than arrest which expose police officers to a comparable degree of danger could not also justify a similar protective response (at least where those circumstances are not the product of police illegality or misconduct). Similarly, *Buie* notes that the arrest there was pursuant to a warrant, so the officers were lawfully on the premises for a proper purpose. *Id*. at 1096 (citing *Payton v. New York*, 100 S.Ct. 1371 (1980)) and 1097. But nothing in *Buie* suggests that the result would have been different had the police otherwise properly entered the house as, for example, pursuant to a proper consent rather than a warrant. *Cf. Payton* at 1374-75 ("We now . . . hold that the Fourth Amendment . . . prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest") and 1378 ("we are dealing with entries into homes made without the consent of any occupant"). Moreover, *Buie* makes clear that neither the arrest nor the warrant sufficed to justify the sweep there, which occurred after the arrest and was of an area of the home well removed from the place of arrest, an area

5

in which the defendant retained a Fourth Amendment protected privacy interest.  *Id*. at 1097, 1099 (citing the holding in *Chimel v. California*, 89 S.Ct. 2034 (1969), that a search incident to an in-home arrest may not extend beyond the area from within which the arrestee might then obtain a weapon).  Rather, the sweep in *Buie* was evaluated on a general Fourth Amendment reasonableness standard, and was justified, in reliance on the principles of *Terry v. Ohio*, 88 S.Ct. 1868 (1968), and *Michigan v. Long*, 103 S.Ct. 3469 (1983), where there was reasonable suspicion that the area swept harbored a person posing a danger to the officers present and the sweep was limited to a cursory inspection of places where a person may be found and lasted no longer than necessary to dispel the reasonable suspicion of danger nor longer than what it takes to complete the arrest and leave the house.  *Buie* at 1096-99.

In *Buie*, two men, one wearing a red running suit, committed an armed robbery and later that day an arrest warrant respecting that offense was issued for Buie and another man (no search warrant was ever issued).  Two days thereafter the police, by having a telephone call made to Buie's house which was answered first by a female and then by Buie, ascertained that Buie was at home, and then proceeded to his house, entered it and looked for Buie on the first and second floors.  Then Officer Rozar went to the top of the basement stairs and shouted into the basement stating "'this is the police'" and "ordering anyone down there to come out."  *Id*. at

6

1095.  Then,

> "Buie emerged from the basement.  He was arrested, searched and handcuffed by Rozar.  *Thereafter*, Detective Joseph Frolich entered the basement 'in case there was someone else' down there.  He noticed a red running suit lying in plain view on a stack of clothing and seized it."  *Id*. (emphasis added).

The Maryland Court of Appeals reversed Buie's robbery conviction holding that the trial court erred by denying his motion to suppress the running suit because Frolich's sweep of the basement was supported neither by a search warrant nor by *probable cause* to believe that a serious and demonstrable potentiality for danger existed there; reasonable suspicion did *not* suffice.  *Buie v. State*, 550 A.2d 79 (Md. 1988).  The Supreme Court vacated and remanded, holding that reasonable suspicion sufficed, and that probable cause was not required, for such a protective sweep.  *Buie*, 110 S.Ct. at 1094-95.

The Supreme Court, though acknowledging that the arrest warrant authorized the police to search for Buie anywhere in the house, including the basement, "*until* the point of Buie's arrest," *id*. at 1096 (emphasis added), nevertheless expressly recognized that "[o]nce he [Buie] was found, however, the search for him was over, and there was no longer that particular justification for entering any rooms [i.e., the basement] that had not yet been searched" and that "Buie had" a Fourth Amendment protected "expectation of privacy in those remaining areas of his house."

7

*Id.* at 1097. This conclusion likewise plainly followed from *Chimel v. California*, 89 S.Ct. 752 (1969), which, as *Buie* noted, "held that in the absence of a search warrant, the justifiable search incident to an in-home arrest could not extend beyond the arrestee's person and the area from within which the arrestee might have obtained a weapon." *Buie* at 1099. *See also id.* at 1098 (*rejecting* argument "that entering rooms not examined prior to the arrest is a *de minimis* intrusion that may be disregarded").

The *Buie* Court thus noted that at "[i]ssue in this case is what level of justification the Fourth Amendment required before Detective Frolich could legally enter the basement to see if someone else was there." *Id.* at 1096. To resolve that issue the Court invoked the general reasonableness standard of the Fourth Amendment, balancing the intrusion on the protected interests against the promotion of legitimate governmental interests, particularly as guided by *Terry* and *Michigan v. Long*. *Buie* thus states:

> "It goes without saying that the Fourth Amendment bars only unreasonable searches and seizures [citation omitted]. Our cases show that in determining reasonableness, we have balanced the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. [citations omitted]. Under this test, a search of the house or office is generally not reasonable without a warrant issued on probable cause. There are other contexts, however, where the public interest is such that neither a warrant nor probable cause is required. [citations omitted].

8

The *Terry* case is most instructive for present purposes. . . . Applying that balancing test, it was held that although a frisk for weapons 'constitutes a severe, though brief, intrusion upon cherished personal security,' [citation omitted] such a frisk is reasonable when weighed against the 'need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest.'

. . .

The [*Michigan v.*] *Long* Court expressly rejected the contention that *Terry* restricted preventative searches to the person of a detained suspect. [citation omitted]. In a sense, *Long* authorized a 'frisk' of an automobile for weapons.

*The ingredients to apply the balance struck in Terry and Long are present in this case*. . . . In *Terry* and *Long* we were concerned with the immediate interest of the police officers in taking steps to assure themselves that the persons with whom they were dealing were not armed with, or able to gain immediate control of, a weapon that could unexpectedly and fatally be used against them. *In the instant case, there is an analogous interest* of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack. . . .

. . . we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. *This is no more and no less than was required in Terry and Long, and as in those cases, we think this balance is the proper one.*" *Buie* at 1096-98 (emphases added; footnote omitted).[1]

---

[1]*Buie* also recognizes as a special category of permissible sweep, one *without* even reasonable suspicion, of "closets and other spaces *immediately adjoining* the place of arrest from within which an attack could be immediately launched." *Id*. at 1098 (emphasis added). The *Buie* opinion language concerning the requirement for reasonable suspicion appearing in the penultimate sentence of the quotation set out in the text above applies to sweeps of areas

9

We recognize that, as stated in *United States v. United States District Court*, 92 S.Ct. 2125, 2134 (1972), and reiterated in *Payton* at 1379-80, 82, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed" and "the Fourth Amendment has drawn a firm line at the entrance to the house."[2] However, *Buie* makes clear that that worthy principle does not preclude application in the in-home sweep context of the general reasonableness standard calculated by balancing the intrusion on Fourth Amendment interests against the promotion of legitimate governmental interests, including those of officer safety. Indeed, *Buie* expressly noted and rejected the Maryland Court of Appeals' refusal to apply the reasonable suspicion standard of *Terry* and *Long* on the ground that "the sanctity of the home" required a more demanding standard. *Id*. at 1096. We also note that recently the Supreme Court in *Knights* applied the same

---

"[b]eyond" those "*immediately* adjoining the place of arrest." *Id*. at 1098 (emphasis added). No one has ever contended that the sweep in the present case is within that special category as to which not even reasonable suspicion is required (and which may or may not depend on the fact of arrest). We accordingly do not further address this special category and this opinion's subsequent discussion of protective sweeps generally should be understood as not referring to it.

[2]The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

general reasonableness, balancing test in upholding a home search, stating "[t]he touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *Knights* at 591 (quoting *Wyoming v. Houghton*, 119 S. Ct. 1297, 1300 (1999)).[3]

Applying this balancing principle, and mindful of *Buie*'s heavy reliance on *Terry* and *Long*, neither of which involved an arrest, we hold that arrest is not always, or *per se*, an indispensable element of an in-home protective sweep, and that although arrest may be highly relevant, particularly as tending to show the requisite potential of danger to the officers, that danger may also be established by other circumstances. We note in this connection the statements in *Long* that "if a suspect is 'dangerous,' he is no less dangerous simply because he is not arrested", *id*. at 3481, and "the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected." *Id*. at 3482 (emphasis

---

[3]*Knights* upheld a reasonable suspicion based law-enforcement (nonprobation related) investigative search without a warrant of a probationer's home where a condition of probation was a blanket agreement to consent to searches.

We also observe that in *Terry*, the Court stated that the "inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs," *Terry* at 1873, and (as *Buie* noted, 110 S.Ct. at 1098), it rejected the notion that the weapons pat-down there was merely a "petty indignity," stating that, to the contrary, it was "a serious intrusion upon the sanctity of the person." *Id*. at 1877.

11

added). *Buie* does state that "the risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory context" such as in *Terry* or *Long*. *Buie* at 1098. *Buie* gives two reasons for that conclusion: first, in the *Terry* and *Long* frisk context the confrontation has "not escalated to the point of arrest" which involves "taking a person into custody for the purpose of prosecuting him," and, second:

> "unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Id*.

While the first reason focuses on arrest, the second does not and seems equally applicable to a police investigatory confrontation in the home as to an in-home arrest. Accordingly, in the in-home context it appears clear that even without an arrest other circumstances can give rise to equally reasonable suspicion of equally serious risk of danger of officers being ambushed by a hidden person as would be the case were there an arrest.[4]

---

[4]*Knowles v. Iowa*, 119 S.Ct. 484 (1998), relied on by Gould, does not point in a contrary direction. There the Court held that a routine traffic stop of an automobile for speeding, for which no arrest was made and only a citation was issued–where there was *no* reasonable suspicion of danger–"does not *by itself* justify . . . a full field-type search" of the car, even though "a full search of the passenger compartment" would be authorized "pursuant to a custodial arrest." *Id*. at 488 (emphasis added). There the Court expressly recognized that *with* reasonable suspicion of danger the officer could conduct a "patdown" both of any occupant of the vehicle *and* "of the [vehicle's] passenger compart" under *Terry* and *Long*. *Id*. All *Knowles* says is that while arrest *alone* may often be enough to give rise to meaningful concern for officer safety (or destruction of evidence), in the absence of arrest there must be some other circumstances giving rise to

12

Several decisions of other circuits have upheld an in-home *Buie* protective sweep even though *not* incident to an arrest.  In *United States v. Patrick*, 959 F.2d 991 (D.C. Cir. 1992), the D.C. Circuit dealt, as we do here, with a consent entry case and upheld the protective sweep of a bedroom in the apartment which the party authorizing entry (the court assumed *arguendo*) had no right to authorize search of, even though the sweep was not incident to an arrest.  The court stated:

> "We first note that, even if Smith could not have consented to the search of Patrick's bedroom, he could, as lessee of the apartment, unquestionably give the police authority to search the rest of it.  *Once the police were lawfully on the premises, they were authorized to conduct a protective sweep* based on their reasonable belief that one of its inhabitants was trafficking in narcotics. . . .We think the holding in *Buie*, notwithstanding the search there was conducted pursuant to a warrant and not consent, supports the police search here.  Accordingly, the police validly entered the bedroom when they looked through the open door and saw Patrick inside."  *Id*. at 996-97 (emphasis added).

Similarly, in *United States v. Taylor*, 248 F.3d 506 (6th Cir. 2001), another consent entry case, the court likewise upheld a protective sweep not incident to an arrest, stating:

> "Taylor argues that a protective sweep is authorized only when it is made incident to a lawful arrest. Therefore, he contends, because Hill had not been arrested when the officers made their cursory search of Taylor's apartment, the sweep was *per se* invalid.  In contrast, the government argues that while *Buie* and *Biggs* [*United States v. Biggs*, 70 F.3d 913 (6th Cir. 1995)]were each decided in the factual context of officers making an

---

reasonable suspicion of danger.

13

arrest, nothing in those opinions indicates that an arrest is a mandatory prerequisite for conducting a protective sweep of the area. The government further points out that the *Buie* decision was based upon the reasoning set forth in the Supreme Court's earlier decisions in *Terry* and *Long*, both of which were investigative stop cases.

We believe the government presents the more compelling argument." *Id*. at 513.

In *United States v. Garcia*, 997 F.2d 1273 (9th Cir. 1993), the court similarly upheld a protective sweep in a consent entry case where no arrest was made until after the sweep discovered guns in plain view.[5]

Also noteworthy is *United States v. Daoust*, 916 F.2d 757 (1st Cir. 1990), an opinion by then Judge (now Justice) Breyer. There the officers, looking through a window into the kitchen of a home, observed a particularly described pistol hanging over the kitchen sink. They then procured a search warrant to search for that particular pistol. Armed with that warrant, they went into the house, but did not confine themselves to going to the kitchen where they knew the gun described in the warrant was, but rather conducted a protective sweep of all the rooms in the house, discovering in those other rooms other weapons (not covered by the warrant) in plain view. There was no arrest or attempted arrest. The First Circuit held that nevertheless the protective sweep was justified under *Buie*.

---

[5]Another consent entry case with a similar result is *U.S. v. Koubriti*, 199 F.Supp.2d 656 (E.D. Mich. 2002).

The cases in which the courts have indicated that protective sweeps must always be incident to arrest, are mostly ones involving situations where the entry into the house was itself illegal.[6]

Having held that an in-home protective sweep is not necessarily or *per se* invalid, regardless of other circumstances, merely because it is not incident to an arrest, we accordingly

---

[6]In *U.S. v. Davis*, 290 F.3d 1239 (10th Cir. 2002), there was an illegal, warrantless entry into the house, which the court held was not justified by exigent circumstances. The constitutionality of the protective sweep is addressed only in a brief footnote, n.4 at 1242-43, where it is rejected because there was no arrest, quoting the first sentence of *Buie*, and also apparently because it was not narrowly confined to a cursory visual inspection of places where a person might be hiding, as required by *Buie.*

*U.S. v. Reid*, 226 F.3d 1022 (9th Cir. 2000), was likewise an illegal entry case, the court holding that the consent to entry had been coerced and that there were no exigent circumstances. The court went on to observe that protective sweep did not apply because there was no arrest and no facts demonstrated that a reasonably prudent officer would have believed that the apartment harbored an individual posing a danger to the officers. *Id*. at 1027. This was a split decision, and does not cite the *Garcia* case in which the Ninth Circuit had held that a protective sweep need not be incident to an arrest.

Gould also cites *U.S. v. Johnson*, 170 F.3d 708 (7th Cir. 1999). That case involved a pat-down search and detention of a person after he had stepped out of the apartment, there was no entry into the apartment, and "no one had consented to a police entry." *Id*. at 719. The police did not have a warrant and there was "no reason to believe that Johnson [who was patted down] was carrying a weapon or any kind of illegal substances at the moment he emerged from the apartment, and Johnson himself took no action himself to make them fearful for anyone's safety." *Id*. at 714. Because the detention and pat-down of Johnson was without reasonable suspicion, it was held invalid. *Id*. at 720. There were three opinions, including a dissent by Judge Easterbrook and a special concurrence by Judge Evans. While the opinion of Judge Wood does contain some references to *Buie*, and the fact that the pat-down of Johnson was neither incident to an arrest nor a cursory visual inspection of those places in which a person might be hiding, *id*. at 716, the issues and factual context of *Johnson* make it completely inapposite here.

disapprove of the language to the contrary in *Wilson*.[7] We note, however, our agreement with *Wilson*'s ultimate determination that the challenged search of the wastebasket and seizure of the checkbook in it could not be justified as a protective sweep. In the first place, there was no evidence in *Wilson* indicating any danger was posed; Wilson was suspected only of stealing from the mail and nothing suggested he (or anyone else present) was dangerous or violent or anything of the kind. In the second place, as *Wilson* itself properly observes, "the seizure of the checkbook from the wastebasket was not within the narrow ambit of a 'cursory visual inspection' of a place where a person could be hiding." *Wilson* at 1035-36 (citing *Buie*, 110 S. Ct. at 1099).[8]

Thus, in the present case the district court erred as a matter of law in holding, in its understandable reliance on the language in *Wilson*, that a protective sweep could never be valid, regardless of other circumstances, unless incident to an arrest, and on that sole basis granting the motion to suppress.

---

[7]We observe that in *Wilson* the panel either did not cite or did not have available to it the opinions in *Patrick, Taylor, Garcia* and *Daoust*. Essentially, *Wilson* simply assumed that *Buie* always requires that the sweep be incident to arrest.

[8]*Wilson* also correctly states that the plain view doctrine did not apply, because the checkbook was not in plain view in the bathroom and because the only thing incriminating about the checkbook was the names on the checks, and they were not visible because of the checkbook cover; the incriminating character of the evidence was not immediately apparent. *Id*. at 1036.

16

## II.  OTHER PROTECTIVE SWEEP REQUIREMENTS

We now turn to the other requirements for a valid in-home protective sweep and their applicability here.

A.  *Other requirements generally*

First, it is at least implicit in *Buie* that although the protective sweep may extend to areas of the home where the police *otherwise* (i.e., *apart* from the protective sweep doctrine) then have no right to go, nevertheless when undertaken from within the home, the police must not have entered (or remained in) the home illegally and their presence within it must be for a legitimate law enforcement purpose.[9]

Further, the protective sweep must be supported "by a reasonable, articulable suspicion", *Buie* at 1099, "that the area to be swept harbors an individual posing a danger to" those on the scene.  *Id*. at 1100.

Next, the legitimate protective sweep may not be "a full search" but may be no more than "a cursory inspection of those

---

[9]Normally, absent a warrant the police may not enter a home except with consent or in "exigent circumstances."  *See, e.g., Payton*, at 1378; *Mincey v. Arizona*, 98 S.Ct. 2408, 2413 (1978); *U.S. v. Jones*, 239 F.3d 716, 719-20 (5th Cir. 2001); *U.S. v. Howard*, 106 F.3d 70, 73-75 (5th Cir. 1997); *U.S. v. Rodea*, 102 F.3d 1401, 1404-05, 1408-09 (5th Cir. 1996); *U.S. v. Rice*, 51 F.3d 495, 500-01 (5th Cir. 1995).  Whether (or if so to what extent and under what conditions) the doctrine of "protective sweep" authorizes a warrantless, non-consensual *entry into* a home that would *not* be authorized under the more general doctrine of "exigent circumstances" is unclear.  *See, e.g., U.S. v. Wilson*, 306 F.3d 231, 238-39 (5th Cir. 2001); *U.S. v. Watson*, 273 F.3d 599, 602-03 (5th Cir. 2001); *U.S. v. Merritt*, 882 F.2d 916, 921 (5th Cir. 1989); *Kirkpatrick v. Butler*, 870 F.2d 276, 281-83 (5th Cir. 1989).  We do not address that question here since under the district court's adequately supported findings the officers' entry into the mobile home was legal as pursuant to valid consent.

spaces where a person may be found." *Id*. at 1099.

Finally, the sweep is subject to two time limitations. First, it may "last[] no longer than is necessary to dispel the reasonable suspicion of danger," *id.*; and, second, it may last no longer than the police are justified in remaining on the premises. *See id.* ("and in any event no longer than it takes to complete the arrest and depart the premises"); *see also id*. at 1098 (police permitted "to take reasonable steps to ensure their safety after, and while making, the arrest").

B.  *Relevant facts and findings here*

1.  *Introduction*

In our review of the district court's suppression order, we observe that the only witnesses at the suppression hearing were three of the deputy sheriffs who were present on the scene, who were called by the Government, and Cabral, the sole defense witness.  The district court explicitly credited the testimony of the deputies and refused to credit Cabral's.[10]

2.  *Officers were legally within the mobile home*

The testimony of the officers was to the effect that Cabral met them at the entrance to the mobile home, that they told him

---

[10]The district court stated "this court finds that the detectives' version of the events of October 17, 2000 is more credible" and "the consistent testimony of these detectives who were sequestered during the evidentiary hearing is more credible than the testimony of the defendant's friend and partner [Cabral], who was allegedly involved in the murder plot and who has been convicted of several crimes."

18

they were looking for Gould and wanted to speak to him.  Cabral said that Gould was in his bedroom, indicating where it was, was probably asleep, and that they were welcome to come in and check it out.  The officers entered, walked toward Gould's bedroom, noticed the door was open but did not see Gould, so conducted a brief protective sweep of the bedroom and its two closets, in one of which the guns were observed in plain view.[11]  The district

---

[11]For example, Deputy Ard testified:

"Q.  And you spoke to Mr. Cabral and told him why y'all wanted to be there?

A.  Yes, sir.

Q.  Okay.  As I understand it, he said that Gould was in his bedroom?

A.  Right.

Q.  Did he say it's okay to go search Kelly Gould's bedroom?

A.  He said, he's in his bedroom.  You are more than welcome to come in and check it out.

Q.  All right.  But he specifically talked about being in his bedroom, right?  He wasn't in Dennis Cabral's bedroom?

A.  No.  He said, his bedroom – if you looking at the trailer, he's to the left.  He said, his bedroom is in the back.  He's in there, and he's probably asleep."

Deputy Brown gave similar testimony, viz:

"A.  . . . We asked him [Cabral] if Kelly Gould was home, and he said, yes, he is. I believe he's asleep in his bedroom, and he pointed toward the north end of the trailer where the only bedroom is on that side of the trailer.

We asked him for permission to come inside the residence to see if Kelly Gould was in the trailer.  We wanted to speak with him.  We did not have any intentions of arresting him at that time.  We just simply wanted to talk to him

19

about the incidents that we've talked about so far. He said, sure. No problem. Come in."

. . .

"Q. Did you in fact enter the trailer at the invitation of Mr. Cabral?

A. Yes, we did."

. . .

"When we entered, we immediately went to the left to the direction where Dennis Cabral had pointed to the bedroom, went toward the bedroom door, which is the only bedroom on that end of the trailer.

When we got to the bedroom, the door of the bedroom was open; so looking for him strictly for officer safety reasons, due to the allegations of wanting to kill police officers, and judges, and those – also the incident that occurred in the courtroom or the Judge's office earlier that day, officer safety was, you know, a predominate issue in our mind. So we entered his bedroom, which the door was open. We looked on the floor. We looked in a closet area to the right of the bed, any place that he could physically hide his body. There was a closet to the left. The closet door was partially open, but not good enough for me to see inside for a person. I opened the door up, looked briefly to see if he was there, never entering the closet itself, and standing in the corner was three weapons, three rifles."

. . .

"Q. Okay. So, did you ask him [Cabral] if Kelly Gould was there?

A. Yes, I did.

Q. Okay. And he told you, he's in the back?

A. He told me that he was in his bedroom. He believed him to be asleep. He pointed in the direction to his right, which would have been to my left."

. . .

"Q. Okay. So the only information he gave you was that Kelly Gould was there? He didn't

invite you to come in?

20

court found that "Cabral consented to the entry of the detectives into the trailer to search for the defendant" and that "the detectives were reasonable in believing that Mr. Cabral was authorized to consent to the search."   However, the court found

---

A. That is not correct.  He did let us come in when we asked him, do you mind if we come in
and see if he's there.

Q. Uh-huh.

A. He said, sure.  Come in.  No problem.  And we entered.

Q. All right.  And he pointed to the back bedroom where Kelly Gould was?

A. He pointed to the back bedroom that he identified as Kelly Gould's bedroom.

Q. Did you ask permission to go in that bedroom?

A. No, sir.

Q. You didn't?  All right.

A. But when I approached the bedroom, Kelly Gould's bedroom, the door was open.

Q. The door of the bedroom was open?

A. That is correct.

Q. You were able to look into the bedroom and look around?

A. Yes.

Q. You went into the bedroom?

A. Yes, I did.

Q. Okay.  Did you look under the bed?

A. I looked for any place that I thought a human person could be hiding possibly."

21

that "[b]ecause there was no indication that Mr. Cabral lived in the master bedroom, he had no apparent authority to consent to a search of the master bedroom." We conclude that the only reasonable construction of the credited testimony is not only that Cabral consented to the officers' entry into the mobile home to look for Gould but also that this consent, at least by the clearest implication, extended to the master bedroom. This is so because, although the officers did not specifically and separately mention the bedroom in asking to come in, they did state they wanted to talk to Gould and asked if they could come in to see if he was there, and Cabral responded that Gould was likely asleep in his bedroom, pointing to it, and stating "you are more than welcome to come in and check it out." Cabral, however, lacked any authority, actual or apparent, to consent to a search of the master bedroom (although he had at least apparent authority to otherwise consent to a search of the mobile home), and for that reason the search of the master bedroom had to be justified as a protective sweep, just as did the search of the basement in *Buie*. The district court declined to justify the search of the bedroom on that basis *solely* because the sweep was not incident to an arrest.

We recognize that protective sweeps following a consent entry may in certain circumstances pose Fourth Amendment concerns not present in cases where the initial entry is pursuant to a warrant. For example, concerns might arise respecting a consent to entry

22

requested for a stated common purpose but actually intended not for that purpose but rather for the purpose of gaining access in order to then make a protective sweep of the entire home for unrelated reasons and thus circumvent the warrant requirement. Concerns of a similar character might also arguably arise where the consent to entry is given expressly or implicitly only as to a limited area but the protective sweep extends clearly beyond that area *without* anything having developed since entry suggestive of greater or more imminent danger than that initially apparent just prior to entry. We do not purport to now ultimately resolve hypothetical cases of those varieties, for the mentioned kinds of concerns are not meaningfully implicated here. The credited evidence does not show and the district court did not find that the officers sought entry for any purpose other than what they stated to Cabral, namely to see if Gould was there and to talk to him, and Cabral, knowing that purpose, consented to the entry. Moreover, the consent which he purported to give was not either expressly or implicitly limited, but rather, by the clearest implication, extended to the master bedroom. Finally, after the officers entered the mobile home and proceeded down the hall towards the master bedroom and approached, but before they arrived at, its entrance, they observed that the bedroom's door was open; Gould was not in his bed asleep, as Cabral had just represented, nor was Gould otherwise visible, so the danger and imminence of ambush then dramatically increased,

23

justifying the few seconds' "sweep" looking under the bed and opening the two bedroom closet doors.

We decline to adopt any across-the-board rule that a protective sweep can never be valid where the initial entry to the home is pursuant to consent, even where the consent does not *of itself* legally authorize the entry into the area swept. Any such rule either would require officers to forego any and all consent entries or would prevent them, once having so entered, from taking reasonable, minimally intrusive, means for self-protection when reasonable suspicion of the danger of ambush arises. Applying the general reasonableness standard of *Buie* and *Knights* we hold that the Fourth Amendment imposes no such Hobson's choice. We note that a "knock and talk" police investigatory practice has clearly been recognized as legitimate. *See, e.g., United States v. Jones,* 239 F.3d 716, 720 (5th Cir. 2001). Certainly, the officers were in the mobile home for a legitimate governmental purpose, namely questioning Gould about the information they had received earlier that day, in two telephone calls from Gould's employee (or co-worker) Forehand, an individual otherwise unknown to them, that Gould, known to be a person prone to violence, was planning to kill two local judges. As the district court recognized, "the officers had a legitimate governmental interest in questioning the defendant about the information they had received."

In its opinion denying the Government's motion for

reconsideration, the district court faulted the officers on the basis that "[t]he officers could have approached the defendant as he left his mobile home one day, or they could have followed him in any other public place, without necessitating the entry into his residence," and that accordingly the officers "created the dangerous situation by approaching and entering the mobile home." Although not explicitly addressed by the district court this raises the question of the potential applicability of our cases holding that although exigent circumstances may justify a warrantless probable cause entry into the home, they will not do so if "the exigent circumstances were manufactured by the agents." *See, e.g., United States v. Rico*, 51 F.3d 495, 502 (5th Cir. 1995). We have indicated that this involves two levels of inquiry, first whether the officers deliberately created the exigent circumstances with the bad faith intent to avoid the warrant requirement, and second, even if they did not do so in bad faith, whether their actions creating the exigency were sufficiently unreasonable or improper as to preclude dispensation with the warrant requirement. *Id.*(recognizing that in *United States v. Socey*, 846 F.2d 1439, 1449 (D.C. Cir.), *cert. denied*, 109 S.Ct. 152 (1988), the D.C. Circuit rejected going beyond the first level of inquiry). Here, there is no finding and no evidence to suggest that the officers acted with the intent to create an emergency to circumvent the warrant

requirement.[12]  We need not and do not here determine whether or to what extent the second (or "reasonableness") level of inquiry in our manufactured exigent circumstances cases, which involve situations where *the entry* into the home otherwise contravenes the Fourth Amendment, should be applicable to situations such as the present one where the entry is pursuant to a valid, non-pretextual consent as above described.  This is because even under that second level of inquiry the officers' actions here may not be deemed to have been improper.  Our exigent circumstances cases have consistently held in this regard that "we will not second-guess the judgment of law enforcement officers where reasonable minds may differ." *United States v. Howard*, 106 F.3d 70, 76 (5th Cir. 1997); *United States v. Rodea*, 102 F.3d 1401, 1410 (5th Cir. 1996); *Rico* at 505.  Here there is absolutely no testimony that the tactics or procedures followed by the officers were unreasonable or contrary to standard or good law enforcement practices (or to the policies or practices of their jurisdictions).  There is no evidence that the officers ever observed Gould away from his home so that they could have followed him and approached him in a public place, or that they had any idea of where he might be other than the mobile home.  The information that the officers received on the evening of October 17 was that Gould, known as a dangerous and violent person,

_____

[12]Had the officers acted with such improper motive or intent, we assume such would have invalidated the sweep.

26

was planning to kill two particular local judges. Clearly, reasonable officers could conclude that the appropriate course of conduct was to go directly to the mobile home, which is where Forehand told them Gould was, rather than wait until "one day", which might well be a day after someone was killed.[13]

We conclude that the officers were legally within the mobile home for a legitimate governmental purpose when the protective

---

[13]In its original opinion the district court found that "[t]he detectives would not have arrested the defendant if they had not found the firearms in the closet, *because they would have had no probable cause that he had committed a crime*" (emphasis added). This was doubtless based on, among other things, the testimony of Officer Brown who stated that prior to seeing the guns in the closet "I had no knowledge there was weapons in the house." However, in its opinion denying the Government's motion for reconsideration, the court states, without referring to its initial opinion, that

> ". . . the officers could have obtained a valid search warrant based on the information provided to them by Mr. Forehand. Mr. Forehand informed the officers that, while at the mobile home one day, the defendant had retrieved a twenty-two caliber rifle, equipped with a scope, from his bedroom and showed it to him. Mr. Forehand also reported that Gould described additional weapons that he owned. (**See Affidavit of Officer Leonardo Moore**, East Baton Rouge Sheriff's Office, p. 3). With this information and the officers' knowledge that the defendant was a convicted felon, the officers should have obtained a search warrant for the mobile home . . . ."

The only cited support is the referenced affidavit of Moore, which is dated July 25, 2001, and is attached to the original criminal complaint in this case. As the Government has consistently pointed out, while the Moore affidavit does state that Forehand so advised the officers, it is clear from the affidavit itself, as well as from the record as a whole, that he did so only on being questioned by the officers at the trailer *after* Gould's arrest. On this appeal, Gould has consistently recognized that that is the case, and has indeed emphasized that the officers did *not* have probable cause to arrest Gould until they saw the guns in the closet. Thus, in oral argument to the panel Gould's counsel asserted that before looking into the closet "they [the officers] had no information as the Government pointed out that he had a gun" and "[t]hey [the officers] didn't know about the guns." Similarly, at oral argument to the en banc court Gould's counsel stated "keep in mind, these folks [the officers ] had no probable cause. They didn't even know there were guns in the house." Accordingly, we disregard the district court's search warrant finding as it is clearly based on a misapprehension of the evidence. We need not and do not determine what the legal effect of this finding would have been.

27

sweep was undertaken.

   3. *The officers had reasonable suspicion of danger*

When the open bedroom door revealed that Gould was not in bed, as had just previously been represented to the officers, or otherwise visible to them, a reasonable basis for suspicion arose that Gould, whom they had been informed was prone to violence and was plotting to kill two judges, might be hiding in the room and posing an imminent danger to the officers. Gould has not challenged this, and the district court found that the officers "needed to locate the defendant for their own safety, so they could make sure he did not launch a surprise attack from a hidden location" and that the bedroom sweep lasted "no longer than . . . necessary to dispel the reasonable suspicion of danger." This element of a legitimate protective sweep is clearly satisfied.

Judge Smith's dissent asserts that the district court's conclusion that the officers were justified in viewing Gould as a threat to their safety is based on the court's concededly erroneous statement in its opinion on reconsideration that Forehand had told the officers in his call earlier that day that Gould had firearms at the trailer, so the officers, knowing Gould was a convicted felon, could, and hence should, have first procured an arrest warrant. Judge Smith then asserts that because the officers lacked such knowledge (in its initial opinion, the district court found that the officers lacked probable cause to arrest Gould until they

28

saw the firearms in the bedroom closet, see note 13, supra) they had no legitimate safety concern justifying the protective sweep when they saw Gould was not in his bed. Judge Smith's reasoning in this respect basically confuses probable cause with reasonable suspicion. In *Buie* the Supreme Court *expressly rejected* the Maryland Court of Appeals' holding that a protective sweep required "probable cause to believe" there was "'a serious and demonstrable potentiality for danger,'" *id*. at 1096, and went on to hold that the reasonable suspicion standard of *Terry* and *Long* governed. Here there is no evidence that the officers had been specifically told that Gould had weapons at the trailer. On the other hand, the credited – indeed the undisputed – testimony is that the officers had been told by Forehand that Gould "had planned to go on a killing spree killing judges, police officers, and minority groups . . . and that he was going to go to some type of place after he did these incidents and hide from the police, and those kinds of things, and snipe anybody out that tried to come in and take him into custody."[14] That a person is planning to go on such a wide killing spree – and thereafter "snipe" at those who might try to take him into custody – certainly suggests that that person has, at the least, ready access to lethal weapons.[15] As a matter of law,

_____

[14]The officers also knew Gould had several arrests and at least one felony conviction for a crime of violence and was known for violent behavior.

[15]Nothing in the record intimates that the officers had any information even suggesting that Gould did *not* have or have ready access to a firearm or firearms or other lethal weapons.

29

the credited testimony establishes that the officers had the requisite reasonable suspicion of enhanced danger when they, at night on Gould's turf, saw that Gould was not in his bed asleep, as Cabral had just told them he was.[16]

4. *The sweep was properly limited in scope and duration*

The district court found that "the officers' search of the master bedroom did not exceed the acceptable scope of a protective sweep, which extends only to a cursory inspection of those spaces where a person may be found, and lasts no longer than is necessary to dispel the reasonable suspicion of danger."  The credited evidence clearly supports these findings and satisfies those elements of a legitimate protective sweep.

*If* the fact that Gould was not in his bed or otherwise visible in the bedroom can be taken as signifying a refusal on his part to talk to the officers and in that sense a termination of their

_____

[16]Where the relevant historic facts are undisputed (or are established by adequately supported district court findings) whether or not there is reasonable suspicion is a question of law. See, e.g., *Blackwall v. Burton*, 34 F.3d 298, 305 (5th Cir. 1994); *United States v. McSween,* 53 F.3d 684, 687 n.5 (5th Cir. 1995); 5 LaFave, Search and Seizure (3d Ed.) § 11.7(c) at 406-07 (". . . the clearly erroneous standard is applied to severable underlying facts while the de novo standard is applied to the ultimate question whether those facts add up to reasonable suspicion"). Moreover, it is clear that the district court never found there was not the requisite reasonable suspicion.  On the contrary, it described its holding as follows: "[t]his court noted the defendant's violent past, and did not dispute that the officers were justified in viewing the defendant as a violent and potentially dangerous individual . . . the officers' search of the bedroom did not exceed the acceptable scope of a protective sweep, *which . . . lasts no longer than is necessary to dispel the reasonable suspicion of danger*." (emphasis added).

consent to be in the mobile home for that purpose,[17] nevertheless that does not mean that the officers could not conduct the sweep. They did not have to go back out of the mobile home without taking some brief, minimally intrusive steps to protect themselves against ambush as they were on the way out. In *Buie* effectuating arrest was the only justification for being in the home, but the sweep of the basement was not *commenced* until Buie was already arrested, searched and handcuffed on the first floor. *Buie* at 1095. The court made clear that the sweep authority extended until the officers not only complete the arrest but also "depart the premises," *id*. at 1099, and that the officers were permitted "to take reasonable steps to ensure their safety *after*, and while making, the arrest." *Id*. at 1098 (emphasis added). Indeed, here, just as the brief sweep of the bedroom was completed the officers heard someone yell that Gould had departed the mobile home through a back door, and they "immediately" likewise departed the bedroom and went outside looking for Gould.[18]

_____

[17]And it is not clearly evident that that is so. There was certainly reasonable suspicion that Gould was hiding under the bed or in the closets, but such suspicion does not exclude the reasonable possibility that he had innocently stepped outside without intending to avoid the officers. Reasonable suspicion is just that, it is not probable cause or a more likely than not standard, and it does not exclude other reasonable possibilities.

[18]Officer Brown testified:
    "After I determined immediately that he wasn't in the room, I started to exit the bedroom, and at that time somebody in – and I don't remember who it was at this time – yelled, I think he just ran out of the back door, which is nearby, near the bedroom area. So I looked and, sure enough, the back door was wide open. So immediately I jumped out the back door looking to see if I could get a visual on

31

The challenged protective sweep was properly limited in scope and duration.

## Conclusion

We hold that a protective sweep as authorized by *Buie* need not always be incident to an arrest. The district court erred in holding otherwise. Applying the standards and limitations articulated in *Buie* and the general reasonableness criteria of the Fourth Amendment, we conclude that the protective sweep here was valid. The district court's suppression order is accordingly

REVERSED.

---

him to try to locate him."

E. GRADY JOLLY, Circuit Judge, concurring in part and dissenting in part:

I agree that a protective sweep need not be conducted incident to arrest to be valid under the Fourth Amendment. The constitutionality of such searches must be assessed under a standard of general reasonableness, in consideration of the factors discussed by the majority.

I also agree that the "knock and talk" is usually a legitimate law enforcement tool, and that the officers in this case were legally in Gould's home based on Cabral's consent.

Under the totality of the circumstances, however, it was unreasonable for the police to enter Gould's bedroom and search his closets, essentially for the reasons discussed by Judge Smith. It seems to me that if the door to the bedroom had been closed -- or even if Gould had been in the room -- the search could have been justified by the majority on basically the same grounds (risk of ambush, etc.) it has used to justify the search of an open room in the absence of the subject.

I therefore would affirm the suppression of the evidence.

JERRY E. SMITH, Circuit Judge, dissenting:

I respectfully dissent from the majority's result and from much of its analysis, largely on the basis ably expressed by Judge DeMoss in dissent. I agree, however, with the majority's conclusion that *United States v. Wilson*, 36 F.3d 1298 (5th Cir. 1994), is in error and must be overruled.

*Maryland v. Buie*, 494 U.S. 325 (1990), is no exception to the longstanding view that "[t]he touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" *United States v. Knights,* 534 U.S. 112, 118-19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)). *Buie* established that a search very much like the present one was reasonable; that conclusion alone is an insufficient basis for deciding (as the panel in this case was precedent-bound to do) that the present search is presumptively invalid, no matter how reasonable.

The majority correctly identifies a number of the factors that are important to assessing the reasonableness of the officers' decision to conduct a protective sweep. SomeSSsuch as the requirement that the search be performed for the safety of the officers; the necessity of having articulable facts from which an officer rea-

sonably could apprehend danger; the importance of limiting the search to a cursory visual inspection of those places that could hide a person; and the cap on the duration of the searchSScome directly from *Buie*, 494 U.S. at 333-36. OthersSSsuch as the legitimacy of the officers' presence and purpose on the scene; the validity and scope of their consent to enter the home; the requirement that facts justify the sweep arise after officers obtain consent to enter for a conversation; and the potentially pernicious effect of allowing officers to themselves create the justification for a sweepSSare reasonable and insightful attempts to compensate for the critical distinction between this case and *Buie*: the absence of an arrest or arrest warrant.[19]

A faithful application of these principles does not, however, lead to the conclusion that the protective sweep was reasonable. At best, it seems we are ill-equipped to reach that conclusion, relying as we must on nothing more than a paper record compiled under the mistaken impression that the reasonableness of the search was wholly irrelevant to its constitutionality. This matter should be remanded so that the rule that the majority properly crafts can be applied in a hearing convened for the purpose of elucidating those facts that bear directly on the reasonableness of the sweep.

---

[19] *See* slip op. at 24-25 (legitimacy of purpose); *id.* at 23-24 (validity and scope of consent); *id.* at 23 (concern that sweeps will be attempted after obtaining consent but before new facts indicate a heightened danger); *id.* at 25-27 (potential that sweep would be improper if officers unnecessarily created dangerous situation).

Solely on the basis of the scant record now on appeal, the sweep was unreasonable, so the order granting the motion to suppress should be affirmed.  Although I agree with most of the persuasive critiques found in Judge DeMoss's forceful dissent, and although I share his concern that there is no such thing as valid consent where the consenting party has no idea that the officers will then be entitled to conduct a search, I write separately to focus on one particularly serious flaw in the majority's analysis.

I start with a point also made by Judge DeMoss:  The majority puffs this court's assessment of the "knock and talk" strategy, taking what was once "not inherently unreasonable," *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001), and making it something that has "clearly been recognized as legitimate."  Slip op. at 25 (citing only *Jones* as authority).  That is quite a transformation in only three years' time.

I doubt even the majority would contend that this now "clearly . . . legitimate" tactic, which consists primarily of approaching a suspect at his home to seek his voluntary cooperation in an investigation, presents the compelling sort of interest found in the officers' duty to execute an arrest warrant.  Officers use "knock and talk" encounters as just one of the many available investigative tools, and they do so hoping that they will be able to determine whether there even exists the probable cause that is necessary to obtain an arrest or search warrant.

36

In seeking the proper balance between privacy and the promotion of legitimate governmental interests, *Houghton*, 526 U.S. at 300, it may well be that our decisions "mean that the police use a tactic like 'knock and talk' somewhat less frequently, but that may be the price of compliance with the Fourth Amendment." *United States v. Johnson*, 170 F.3d 708, 718 (7th Cir. 1999). There are other lawful ways for police to pursue their investigation without testing the limits of the Fourth Amendment, includingSSas the district court foundSSby returning another day when Gould was present and amenable to speaking with them.

I make this point only to highlight a significant principle that the majority opinion recognizes but fails to invoke: However high the government's interest in protecting its officers, there must be some other legitimate purpose for which officers secure themselves. *See* slip op. at 25. A search that does nothing more than allow the officers safely to remain in a place where they have no reason or right to be will, of necessity, be unreasonable in all but the rarest of circumstances. The majority's assessment that the police have a legitimate interest in pursuing "knock and talk" encounters suffices to create a justification for the officers' presence in Gould's trailer, and it plays a large role in the eventual conclusion that this search was reasonable in light of all the circumstances.

Yet, even assuming the majority correctly assesses the legiti-

37

macy of the "knock and talk" technique, a reasonable officer would have known, before entering Gould's bedroom, that the original purpose of the encounter would not be realized that day. At best, from the officers' perspective, Gould was not home and was unable to discuss the allegations made against him. At worst, he was hiding and did not wish to speak with them.[20]

As Judge DeMoss rightfully recognizes, slip op. at 7-8 (DeMoss, J., dissenting), the majority glosses over this error by assessing the legitimacy of the officers' purpose and the reasonableness of their fear at two different points in time. Slip op. at 25, 28-29. It is true that at one point, the officers were in the mobile home with a valid purpose: to discuss with Gould the serious allegations against him. It is equally true that the officers were, at another point, in the bedroom with a legitimate fear: that Gould was hiding in a closet and posed a threat to their safety. But there is no consanguinity between these points. The legitimate purpose of the encounter had all but evaporated by the time the majority concludes the officers possessed a valid fear.

The officers had no reason to enter Gould's bedroom if Gould was not therein, voluntarily cooperating. An empty room serves no investigative purpose where the entire focus of the investigation is on having a conversation. This fact is illustrated by the action

---

[20] The fact that Gould was found hiding in the woods, wearing only his boxer shorts, adequately attests to the fact that the latter of these two possibilities was the more realistic that day.

38

taken by the officers as soon as the room was secure: They left it. Inasmuch as the sweep served no purpose other than to secure a room in which the officers had nothing to do, it was unreasonable and in violation of the Fourth Amendment.

The majority has a rejoinder to that argument: Regardless of whether the officers should have known that their quest for a "knock and talk" encounter had been rendered fruitless, they nonetheless possessed a compelling interest in securing the mobile home so they could safely depart from it. Slip op. at 29-30. I agree that this is one of two articulated justifications for the sweep in *Buie*,[21] and, if supported by the record, conceivably could serve to make the sweep reasonable as well. The record, however, flatly refutes that view. Moreover, the majority's assertion to the contrary is based in large part on a factual finding that it previously overturns as being clearly erroneous.

There is no dispute that Cabral lacked even the apparent authority to consent to the entry into Gould's bedroom. Slip op. at 22-23. As a result, the sweep must be justified on the basis of the threats facing the officers at the instant before they entered that room. *Id.* That is to say, once the officers observed that Gould was not in his bedroom (which they could not enter without his consent, nor had an investigative reason to enter without his

---

[21] *See Buie*, 494 U.S. at 335-36 ("The sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises.").

presence), their decision to enter and conduct a sweep is reasonable only if they would have faced a greater danger by not entering.  The majority appears to conclude that it was not only safer, but obviously so, for the police to enter the room that potentially housed a danger, than it was to retreat the few feet toward the doorway they had used only an instant before.

We are not faced here with Daedalus's Labyrith or the Minotaur lurking somewhere inside.  The officersSSone of whom already had his gun drawnSSwere in a fourteen-by-sixty-foot trailer home, and there is every indication that they had as plain a view of their path to retreat as they did of the empty bedroom.[22]  The government has not even argued, in its briefs, that the officers were unable to depart safely.

Instead, the government's posture throughout this case is that there was no need to flee, because the officers still were conducting a valid "knock and talk" investigation.  As I have shown, and as the majority tacitly concedes, slip op. at 29, that claim is inconsistent with the scope of the "knock and talk" technique, which has, as its central premise, the presence of a voluntarily cooperating witness.  To compensate for the absence of any investigative

[22] Here again, the sparse record inhibits the court's ability truly to assess whether the sweep was a reasonable alternative to a safe retreat.  At en banc oral argument, significant time was devoted to the question whether this was a single-wide or double-wide trailer home, and what effect that might have on the officers ability to leave the scene safely.  It is apparent that such questions became relevant only *after* the court determined that *Wilson* was not good law, and there should be no great surprise in finding that a district court's memorandum addressing an entirely different question provides poor fodder on which to graze.

purpose to the sweep, the majority instead has adopted the notion that there was a greater danger in retreating than there was in sweeping, a claim not supported by the district court's findings of fact, to which we ordinarily should defer.

As the majority correctly observes, the officers knew Gould had a violent past and was alleged to have been making threats against government officials. But all those facts were known to the officers before they decided even to enter the house. If that alone placed them in an unjustified state of danger, that was so as much at the time they elected to enter the mobile home as when they chose to sweep. If the majority's new rule is taken to countenance a sweep whenever police seek voluntary consent to enter a building that they already perceive to be intolerably dangerous, Judge DeMoss is surely correct to assign this investigative technique the new moniker: "knock, enter, maybe talk, and search." Slip op. at 6 (DeMoss, J., dissenting).[23]

Apparently, however, this is not the point the majority is

_____

[23] There is no basis for the majority's conclusion, slip op. at 12, that this situation was inherently dangerous, as the Supreme Court described the in-home arrest in *Buie*. In *Buie*, 494 U.S. at 333, the Court recognized the danger an officer faces when forced to effect a confrontational encounter on his "adversary's 'turf.'" Here, although the majority correctly recognizes that a "knock and talk" encounter does not include the potentially explosive confrontation of an arrest, slip op. at 12, it nevertheless concludes that the encounter is dangerous by virtue of being on the adversary's turf. *Id.*

This completely mistakes the fact that in a "knock and talk" encounter, there is no adversary. The whole point is to approach a citizen and learn something through voluntary cooperation.

41

attempting to make, for it unambiguously requires officers to justify the sweep on the basis of evidence that was discovered *after* they obtained consent to enter. Slip op. at 23. Nevertheless, though the majority laudably imposes this limitation on its new rule, the majority has not faithfully applied that rule to the present record.

The only fact to which the majority points for its explanation of how the officers went from the point of being safe enough to enter the room to the point of being threatened enough to justify a sweep, is the finding that Gould was not in the bedroom where Cabral said he would be. The most natural inference to draw from that fact is that Gould was not home, or that if he was home, he wanted nothing to do with the officers.

Even assuming the reasonableness of the belief that Gould instead was preparing to ambush the officers as they left the sceneSSsomething he chose not to do when they entered the home, and was far more likely to do when the officers drew nearer in their search for himSSthat would pose a threat to the officers only when they were outside the bedroom, if they also believed Gould was in possession of a firearm. This is the unambiguous basis on which the district court determined that "the officers were justified in viewing the defendants as a danger to their safety," a statement that immediately follows the paragraph in which the court states that the officers knew, before they arrived at the scene, that Gould had a firearm. But the majority cannot possibly reach the same

42

conclusion, because its opinion also states that the district court clearly erred when it found that the officers knew about the weapon! Slip op. at 27 n.13.

As a result, there is no basis in the record for the majority's contention that it was more dangerous for the officers to leave the room instead of entering a confined area that they suspected housed a threat, and start poking around. That is a theory that was manufactured out of whole cloth at the en banc oral argument.

If the majority genuinely suspects that this might have been the case, the best it can do is remand so the record can be developed with an eye to the correct governing legal standard. As the court correctly determines today, that standard is not just whether the sweep was made incident to arrest (as *Wilson* erroneously led the district court to believe), but rather whether the sweep was a reasonably necessary, minimally intrusive means of securing an area in which the officers needed to perform a task of compelling importance.

The majority recites, then loses sight of, the well-established maxim that "physical entry of the home is the chief evilagainst which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585 (1980). Because the majority thereby gives insufficient respect to the constraints of the Fourth Amendment, I respectfully dissent.

DeMoss, Circuit Judge, dissenting, joined by Stewart, Circuit Judge.

Because the majority opinion essentially creates another exception to the constitutional requirement that nonconsensual warrantless searches are unreasonable and this newly created exception is overly broad and unnecessary, I respectfully dissent.

This case presents the difficult issues of: (1) whether the protective sweep exception defined by the Supreme Court in *Maryland v. Buie*, 494 U.S. 325 (1990), is limited to situations involving the execution of an arrest warrant as we held in *United States v. Wilson*, 36 F.3d 1298 (5th Cir. 1994); and if not (2) whether the search in this case was reasonable. In addressing these two issues, I think the majority makes three significant errors. First, the majority's starting point in its Fourth Amendment analysis concerning a warrantless search of a home is faulty and therefore the majority does not fully account for the lack of consent in this case. Second, the majority's reliance on the so-called "clearly" legitimate "knock and talk" police investigatory tactic is misplaced and therefore the majority's holding leads to an end-run around the Fourth Amendment's protections. Third, the majority has misconstrued the holding of the Supreme Court in *Buie*. I will address these three errors in order.

**I.**

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported

by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  Further, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 477-78 (1971)).  Additionally, the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  *United States v. United States District Court*, 407 U.S. 297, 313 (1972).  Accordingly, our law dictates that unless some exception applies, the search at issue in this case, a warrantless nonconsensual search of Kelly Gould's bedroom in his home, must be found unconstitutional.

The majority is correct that the Supreme Court has outlined a "general reasonableness approach" that can be applied in Fourth Amendment cases and which requires balancing the intrusion on the protected interests against the promotion of legitimate governmental interests.  *See, e.g., United States v. Knights*, 534 U.S. 112, 118-19 (2001).  This reasonableness inquiry, however, is to be conducted within the bedrock legal boundaries outlined above, *i.e.*, a nonconsensual warrantless search of a home is presumed unreasonable. *Id*. at 121 (describing what the Fourth Amendment normally requires). The inquiry conducted in *Knights*, that the majority purports to rely on in this case, is in fact within these legal boundaries because

45

unlike in this case, the defendant in *Knights* was on probation and as a term of his probation had consented in writing to unannounced searches of his home.  *Id.* at 114.  The Supreme Court found the "probation search condition" a "salient circumstance" and thus both the intrusion on the defendant's expectation of privacy was less and the governmental interest was greater, *i.e.*, heightened concerns due to the fact that probationers are more likely to engage in criminal conduct, making the search at issue in that case constitutional. *Id*. at 118.  Therefore, unlike in this case, where there is no probation and no general consent agreement, the Supreme Court's reasonableness inquiry in *Knights* is well within established Fourth Amendment jurisprudence.

Unfortunately, the majority opinion skips some significant concerns in this case and does not address the established legal principles I have already outlined.  The majority's inquiry starts by giving too little credence to Gould's privacy interest and the intrusion of the officers coming into his house late in the evening to look for him when they had no factual basis whatsoever for assuming he would be agreeable to talking to them or that he was even present.  When a search is performed pursuant to consent, the government has the burden of proving that the individual who gave consent had the authority to do so and that the search was conducted within the scope of that consent. *United States v. Ibarra*, 965 F.2d 1354, 1356 n.2 (5th Cir. 1992) (en banc).  "The standard for

46

measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The majority opinion emphasizes that the officers were legitimately in the home. The record, however, is clear that the officers did not have consent to enter Gould's bedroom. Even resolving all factual disputes and making all credibility determinations in favor of the government, the testimony at the suppression hearing indicated that Cabral thought Gould was either in the backyard working out or in his (Gould's) bedroom. As officers went back to the bedroom they may have thought Gould was possibly there but they testified that he did not appear to be present and they understood that they never had consent to enter the bedroom. The legitimacy of the officers' presence, if legitimate at all, ended at the threshold to the bedroom door.[24] The majority seems to wash over this concern by not fully addressing the issue and instead references the very distinguishable *Knights* holding.

---

[24]The majority indicates that the protective sweep allowed the officers to go into an area that they did not have consent to enter, *i.e.*, the bedroom. Consent is an issue concerning the officers' legitimacy to be on the premises and where this legitimacy begins and ends is a significant issue which the majority discusses in a contradictory fashion. For instance, if the officers had consent, they certainly exceeded the scope of the consent when they entered the bedroom. On the other hand, if the protective sweep exception allows the officers to enter the bedroom then the original consent validating their presence in the residence certainly did not understand this to be within the scope of the consent and therefore the consent was invalid and the officers' presence was not legitimate in the first place. Under the majority's view there is no way to resolve the issues regarding consent.

This case, however, is different than *Knights* because here the consent did not extend to the entire residence. If the majority believes the search was based on consent then that should be the holding, rather than creating an additional unnecessary and overly broad exception to the warrant requirement.[25] In summary, because the majority starts from the wrong place, it ends in the wrong place and hence its Fourth Amendment analysis is flawed.

**II.**

In satisfying its first requirement of this newly created exception to the protections afforded by the Fourth Amendment, *i.e.*, that the officers were legally present in the mobile home, the majority relies on the "knock and talk" police investigatory tactic mentioned in *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001). The majority refers to this practice as being "clearly . . . recognized as legitimate." The "knock and talk" tactic is hardly well-established law.[26] The Fifth Circuit case establishing the

---

[25]Of course, such a holding would be contrary to the district court's finding that Cabral did not have authority to consent to the search of Gould's bedroom and after all, it is Gould's privacy interest that is at stake in this case.

[26]There are two aspects of *Jones* which make it a very weak decision upon which to posit a new exception to the Fourth Amendment. First the gun in *Jones* was lying in plain view on a kitchen table visible to the police officer standing outside the screen door of the entrance to the apartment. *Id*. at 719. The district court in *Jones* found that this hand gun in plain view was an "exigent circumstance," justifying the officer's entry into the apartment without a warrant. *Id*. at 720. No such circumstance exists here in *Gould*. Secondly, it is noteworthy that *Jones* has never been discussed or cited by the Supreme Court. Several other circuits have cited *Jones* but only the Sixth Circuit has really examined the *Jones* case and indicated some agreement with the Fifth Circuit's "knock and talk" concept. *United States v. Carter*, 315 F.3d 651, *4 n.6 (6th Cir. 2003)

(continued...)

concept of "knock and talk" merely states that "[t]his investigative tactic is not inherently unreasonable." *Jones*, 239 F.3d at 720.

Use of the "knock and talk" tactic may be reasonable in some cases, *e.g.*, police may follow-up on a lead and approach a citizen, seeking the citizen's cooperation. In this case, however, the officers conducted an intrusive search of a bedroom with neither consent, nor search warrant, nor arrest warrant, nor any exigent circumstances. The majority has created an exception that permits an officer to ask for permission to enter a home from a third party who may have authority to consent to only part of the home but not all of the home and then immediately contend that he, the officer, is so apprehensive about his own safety that he must conduct a protective sweep of areas where he has no consent to be, when the officer had no obligation or duty to enter the home in the first place. This new exception is really a "knock, enter, maybe talk, and search" police investigatory tactic, all conducted without a warrant, and resulting in an end-run around the protections afforded by the Fourth Amendment.

In addition, the majority has not stated why their new exception is necessary or why we should not find that the officers created a situation that resulted in a Fourth Amendment violation when they in fact had many other permissible ways to pursue their

---

[26](...continued)
(vacated for rehearing *en banc*). This Sixth Circuit opinion, however, has now been vacated because the case was heard *en banc*, but there is presently no subsequent opinion available.

investigation, *i.e.*, seeking a search warrant based on the informant's tip. The majority does address the issue of exigent circumstances that can sometimes make a warrantless search permissible. This search, however, as the majority agrees, is not based on any exigency. In fact, as the district court noted the officers "could have approached the defendant as he left his mobile home one day, or they could have followed him and approached him in any other public place without necessitating the entry into his residence." Just as there was no consent, there was no exigent circumstance to support this search.

Recognizing that the officers cannot create the exigency, we evaluate the reasonableness of the officers' conduct not at the point of the search but prior to the point when the encounter escalates making a search necessary or a foregone conclusion. *United States v. Munoz-Guerra*, 788 F.2d 295, 298 (5th Cir. 1986). Therefore, in this case, the officers' conduct is not evaluated at the point when they are searching for Gould because according to the government the officers are concerned that Gould might ambush them. Instead the reasonableness of the conduct is evaluated at the point in time when the officers call for Gould and he does not answer because according to the officers' testimony he does not appear to be in his room. *United States v. Gould*, 326 F.3d 651, 652 (5th Cir. 2003). At that point in time, it is more reasonable to assume Gould is either not present or if present does not wish to talk to the

50

officers, than that Gould is about to unleash some surprise attack on the officers.  Likewise, it is unreasonable for the officers, under no duty to execute an arrest warrant and not having consent, to go into Gould's bedroom to seek him out.  The officers had no duty to persist, and in fact the officers had no authority to persist, in their search for Gould.

Of course, the government does not argue that the officers were searching for Gould wishing to talk to him because such a search is not within the protective sweep exception.  Rather the government argues the officers were afraid Gould would attack them.  This argument is contrary to the undisputed facts in the record that indicate Gould was at best avoiding the officers and at worst unaware of the officers because he was in the backyard.  And although the officers knew of Gould's violent past, there is nothing in the record to establish that Gould would be waiting for the officers in order to ambush them.  Because the officers could not obtain the cooperation of Gould or because Gould actually was not present, the officers' use of the "knock and talk" tactic, by definition, was unsuccessful and therefore the officers should have pursued their investigation by other means and not by an illegal search.

The majority is worried that affirming the district court's decision to grant the motion to suppress will mean that law officers cannot use the "knock and talk" tactic if they are apprehensive of being ambushed.  But voluntary engagement with law officers and not

51

an ambush situation is precisely what the "knock and talk" tactic requires and to define the tactic as broadly as the majority has is essentially to do away with the warrant requirement.  In other words, in some situations, such as this case, the "knock and talk" tactic progressed as far as lawful when Gould was non-responsive or not present.  At that point, the officers should have pursued other means to continue their investigation--that is what the Fourth Amendment requires.  The majority's opinion is an unreasonable extension of the "knock and talk" tactic and does not fully account for the well-established Fourth Amendment principle that a warrantless nonconsensual search of a home is presumed unreasonable and in this case there was no exigency and nothing necessitating the intrusion into Gould's bedroom.

**III.**

We decided to review *en banc* the *Gould* case to determine: (1) whether the rule established in *Wilson* that a protective sweep of a home was limited to an arrest situation, as defined by the Supreme Court in *Buie*, was correct; and (2) if the protective sweep exception to the search warrant requirement is not limited as *Wilson* and *Buie* indicate, whether the warrantless search of Gould's bedroom was reasonable.

The majority characterizes the rule outlined in *Wilson* as a "bright-line" rule; *Wilson*, however, directly follows the precise language used by the Supreme Court in its  definition of the

52

protective sweep exception in *Buie*.  *See Wilson*, 36 F.3d at 1305-06.

The protective sweep exception as outlined in *Buie* requires the

following three elements.  First, the officers must be executing an

arrest warrant in a suspect's home.  *See generally Buie*, 494 U.S.

325 (mentioning over 65 times the concept of arrest in a home when

defining a protective sweep).  Second, the officers must perceive

some danger from another person or persons.  *Id.* at 332-36

(indicating that not every in-home arrest will justify a protective

sweep and listing several factors that are used to validate the

reasonableness of the perceived danger, such as the nature of the

crime for which the arrest is being executed, the likely presence

of cohorts, and the time and place of arrest).  Third, the search

may only be a quick and limited cursory inspection of those places

another person might be hiding.  *Id.* at 335-36.  Here, the majority

has ignored the first two elements and only addressed the third.[27]

Of course, there is good reason for the limited definition as

outlined in *Buie* and tracked by this Court in *Wilson*.  Such a

---

[27]The Supreme Court has never expanded the concept of the protective sweep from its original limited definition in *Buie.*  In fact, there are only three Supreme Court cases even citing *Buie*, none of which include a discussion of the contours of the protective sweep.  *See Richards v. Wisconsin*, 520 U.S. 385, 394 (1997); *United States v. James Daniel Good Real Property*, 510 U.S. 43, 67 (1993); *Horton v. California*, 496 U.S. 128, 140 (1990).  The only slightly relevant citation occurred in *Richards* where the Supreme Court addressed the appropriate balance between legitimate law enforcement concerns at issue in the execution of search warrants and individual privacy interests affected by no-knock entries.  520 U.S. at 394.  The *Richards* Court cited *Buie* for its allowance of "a protective sweep of a house ***during an arrest*** where the officers have 'a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.'"  *Id.*  (citing *Buie*, 494 U.S. at 337) (emphasis added).

definition avoids the quagmire that the majority finds itself in after rejecting the language in *Buie* and *Wilson*. The majority is forced to fashion a new exception with alternative elements that are vague; and as such the new exception swallows the rule that a warrant is generally required for an in-home search. After fashioning a new exception the majority is then forced to apply its vague standards and determine if the search at issue here was reasonable. Because the district court did not address the reasonableness of the search, it would seem more appropriate to me for this Court to remand the case for a more detailed inquiry into the complicated and extremely fact specific issue of reasonableness. *See Buie*, 494 U.S. at 337 (noting that remand was required to determine if the protective sweep, although conducted in the context of the execution of an arrest warrant, was based on a reasonably perceived threat of danger from an additional person and was a limited cursory inspection as defined by the Supreme Court). Remand to address this complicated inquiry, however, would not be necessary if the holding of *Buie* is followed.

First, the element that the officers must be executing an arrest warrant in a home in order to conduct a protective sweep cannot be so easily disposed of and an alternative substituted for it. As the *Buie* court noted:

> The risk of danger in the context of an arrest in the home is as great as, if not greater than, it is in an on-the-street or roadside investigatory encounter. . . . A protective sweep . . . occurs as an adjunct to the

54

> serious step of taking a person into custody for the
> purpose of prosecuting him for a crime. Moreover, unlike
> an encounter on the street or along a highway, an in-home
> arrest puts the officer at the disadvantage of being on
> his adversary's "turf."

494 U.S. at 333; *see also Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (finding that the danger to the officers "flows from the fact of the arrest, and its attendant proximity, stress, and uncertainty"). In place of this element the majority substitutes the following element: the police presence in the home must be for a legitimate law enforcement purpose. The majority's element is an inadequate substitution. There are many legitimate law enforcement purposes that may permit officers to do something short of conducting a warrantless search, *e.g.*, enter a home for the purpose of talking to the person who gave the officers consent and had authority to consent to the entry. Such a legitimate purpose does not somehow give the officer *carte blanche* to then search the house.[28] In the protective sweep situation, as defined by *Buie*, the officers must have more than a legitimate purpose to be in the home, the officers must have a compelling reason, *i.e.*, be in the house under the obligation to execute an arrest warrant. This requirement is, in fact, the essence of the *Buie* holding and this requirement is a limiting factor on the officers' conduct that is missing from the majority's opinion.

---

[28]See the discussion of the problems with the majority's analysis of consent in section I of this dissent.

Second, *Buie* is not about fear of the person to be arrested. 494 U.S. at 328 (noting that Buie was already arrested when the protective sweep was conducted). Such a fear or concern for officer safety is already sufficiently protected by allowing the officers to actually execute the arrest warrant and search for the person subject to the arrest if necessary. *See, e.g., Chimel v. California*, 395 U.S. 752, 763 (1969) (addressing both the threat posed by the arrestee and the scope of a search incident to an arrest). *Buie* is about a reasonable, articulable suspicion "that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 337. Here, there is no such fear, and the majority opinion allows the officers to do something they normally would need a warrant to do, search a residence which they do not have consent to search and where the resident is either not present or not interested in talking to them. Again, the majority's neglect of this requirement leads to an overly broad new exception to the Fourth Amendment.

The majority opinion mentions two temporal limitations on the protective sweep that were articulated in *Buie*. These limitations are: that the protective sweep "last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Buie*, 494 U.S. at 335-36. The majority, changing the language of these limitations slightly, neglects the fact that these

56

limitations depend on the arrest and the officers search for someone other than the arrestee and therefore apart from these requirements the limitations are hollow and void of any objective criteria, *i.e.*, the duration of the arrest, by which to evaluate the officers' conduct. Under the majority's view these limitations are meaningless and this again points out the vagueness of the majority holding in this case.

Finally, in my view this case should have never been prosecuted in federal court. The original criminal conduct which precipitated the arrest was strictly local in nature: one Louisiana resident (Forehand) reported to the sheriff of one Louisiana parish (and not to the FBI, the DEA, the ATF, or the U.S. Marshall Service) that another Louisiana resident (Gould) had made oral threats to kill two Louisiana judges (not federal judges) and some other Louisiana residents (not residents of another state) apparently because of a proceeding of some sort in a Louisiana court (not a federal court) relating to a state law claim (not a federal question). If the admonitions in *United States v. Lopez*, 514 U.S. 549 (1995) and *United States v. Morrison*, 529 U.S. 598 (2000) about drawing a line between local and national interests have any meaning at all, then this criminal investigation would have undoubtedly fallen on the local side of the line. All of the law enforcement actors in this case were state officers.

Furthermore, I think it would be ridiculous to conclude that

the firearms found as a result of a warrantless search in Gould's closets in Gould's bedroom in Gould's trailer home in the woods of rural Louisiana had any effect whatsoever, much less a substantial effect, on interstate commerce as *Lopez* and *Morrison* require for a federal prosecution. *Lopez*, 514 U.S. at 562-63; *Morrison*, 529 U.S. at 608-09.

The events which precipitated this case occurred on October 17, 2000. The federal indictment in this case was not handed down until August 9, 2001, more than 9 months later, which clearly indicates that the federal indictment was an afterthought. To better understand this anomaly and what actually happened during this period, I have prepared from the record a factual chronology of the events in this time frame which is attached as Exhibit A to this dissent.

From the chronology in Exhibit A, I would suggest that the following conclusions should be readily drawn:

A.   The dismissal on March 5, 2001, of the state solicitation for murder charge for "no probable cause" pulls the rug out from under the government's assertion that Gould's "threats to kill" were sufficiently real and immediate to justify talking with him even without any warrant; and

B.   The decision of the state court on July 25, 2001, to grant Gould's motion to suppress pulls the rug out from under the subsequent federal indictment based on identical facts; and should have been disclosed to the federal district court addressing the federal suppression hearing. Had it been, the federal district court might well have based its decision on the alternate ground that the state had already ruled the seizure of the firearms was

58

unconstitutional.

In summary, the Fourth Amendment is the keystone that holds up the arch of our Bill of Rights which in turn is the unique contribution of our founding fathers to our system of government which has now survived longer than any other representative government in the world. In his famous dissent in *Olmstead v. United States*, Justice Brandeis called privacy-which he defined as: "the right to be let alone"-"the most comprehensive of rights and the right most valued by civilized men." 277 U.S. 438, 478 (1928)(Brandeis, J., dissenting). Justice Brandeis argued that the framers knew that Americans wanted protection from governmental intrusion not only for their property, but also for their thoughts, ideas and emotions. Take away the Fourth Amendment and the right of privacy disappears.

The deputy sheriffs here in *Gould* made no attempt to develop a sworn affidavit in writing from the purported informant, Forehand,[29] and they therefore made no attempt to get either a search warrant or an arrest warrant from an independent third party magistrate on the basis of probable cause. I have no doubt that the

---

[29]After giving oral reports over the telephone to the deputy sheriffs about Gould and after being present at Gould's trailer house on the night of Gould's arrest, Forehand disappears from the investigation and processing of this trial. Forehand never gave a written statement to the deputy sheriffs and did not testify for the government at the suppression hearing so the government's case as to the need for the police to interview Gould (*i.e.*, Gould's threats to kill state judges) is based entirely on the hearsay testimony of the deputy sheriffs. There is nothing in this record that demonstrates the reliability or credibility of Forehand as a previous informant of the sheriff's department.

deputy sheriffs believed that they were acting reasonably and with good intentions. But the old adage warns us that "the road to hell is paved with good intentions." In my judgment, that is precisely where the majority opinion wants to put us-by unhooking the "protective sweep" from its connection with the execution of an arrest warrant in a home, which is where the Supreme Court framed the concept. In my view the gambit of getting permission to enter a citizen's home in order to talk to someone and then conducting a protective sweep search under the guise of sensing danger to the investigating officer will effectively eliminate the need for complying with the Fourth Amendment and at that point we will all be, literally and figuratively, on the road to hell.

## Conclusion

The majority opinion creates a new exception to the Fourth Amendment that is overly broad and unnecessary. The district court's granting of the motion to suppress in this case should be affirmed. For these reasons, I respectfully dissent.

# CHRONOLOGY

1. On October 17, 2000, the Livingston Parish Sheriff's Officers on the scene arrested Gould and charged him with the state crime of possession of a firearm by a convicted felon. *See* LA. Rev. Stat. Ann. § 14:95.1 (West 2004), in Cause No. 15571, 21st Judicial District Court, Livingston Parish.

2. On October 18, 2000, an arrest warrant was issued out of the East Baton Rouge Parish charging Gould with Solicitation for Murder. *See* LA. Rev. Stat. Ann. § 14:28.1 (West 2004).

3. Gould was in the custody of the East Baton Rouge Parish from October 18, 2000, until March 5, 2001, when no probable cause was found for the Solicitation for Murder charge.

4. On March 5, 2001, Gould was returned to the custody of the Livingston Parish on the felon in possession charge.

5. On May 31, 2001, Gould filed a motion to suppress evidence obtained without a warrant in Cause No. 15571 in the 21st Judicial District Court of Louisiana. Gould's motion was based on his argument that all physical evidence and any statements to be used against him were obtained without a search warrant and without his consent. An evidentiary hearing was held on Gould's motion to suppress on July 25, 2001, at which one of

# CHRONOLOGY

the officers who arrested Gould on October 17, 2000, testified. At the end of this hearing the state judge granted Gould's motion and bond was set and the case was continued until September 19, 2001. *No. 15571, Louisiana v. Kelly Gould.*

6.  Also on July 25, 2001, a federal criminal complaint was filed in the United States District Court for the Middle District of Louisiana charging Gould with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The person who swore out the affidavit was an agent of B.A.T.F. not one of the deputy sheriffs that was present on October 17, 2000, at Gould's arrest. This affiant was apparently unaware of the fact that the state complaint on the solicitation for murder charge had been dismissed and the fact that the state felon in possession charge had been put on hold after the granting of Gould's motion to suppress since he made no mention of those proceedings.

7.  Gould made his state bond on July 26, 2001, and was released from state custody.

8.  On August 9, 2001, Gould was indicted by a federal grand jury on the federal gun charge.

# **CHRONOLOGY**

9.    On August 17, 2001, there was a federal detention hearing and following the hearing Gould was ordered detained on the federal charges.

10.   On September 19, 2001, the 21st Judicial District Court of Louisiana continued the state case against Gould subject to reassignment to another judge.

11.   On December 19, 2001, the federal district court held a hearing concerning Gould's motion to suppress.  At this hearing there was testimony from the following local law officers:  Detective Jim Brown who was in charge of the case for the Livingston Parish Sheriff's Office testified; his partner the night of the visit to Gould's trailer, Officer Jason Ard testified; and Lieutenant Carl Krester, who had been assigned the case from the East Baton Rouge Sheriff's Office and was also present at Gould's trailer, testified for the government.  Dennis Cabral who worked with and lived with Gould and was present the night of the search testified for the defense.  The B.A.T.F. agent who swore out the federal complaint on July 25, 2001, did not testify.  Likewise, Forehand did not testify.

12.   On April 2, 2002, the federal district court granted Gould's federal motion to suppress.

63

# CHRONOLOGY

13.  After granting the motion to suppress the federal district court continued the trial date indefinitely pending the government's appeal of the granting of the motion to suppress.

14.  Gould's motion to be released on bond pending appeal was denied on June 3, 2002, and according to the record Gould has remained in federal custody.

# <u>CHRONOLOGY</u>