UNITED STATES of America, Appellee,

v.

Olawale Olamrewaju OGUNS, Defendant–Appellant,

Adenrele, et al., Defendants.

No. 172, Docket 90–1098.

United States Court of Appeals, Second Circuit.

Argued Sept. 21, 1990.

Decided Dec. 17, 1990.

Henriette D. Hoffman, The Legal Aid Society, Federal Defender Services Unit, New York City, for defendant-appellant.

David C. James, Asst. U.S. Atty. (Andrew J. Maloney, U.S. Atty., Rona M. Wittels, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellee.

Before OAKES, Chief Judge, MESKILL, Circuit Judge, and RESTANI,* Judge.

MESKILL, Circuit Judge:

Olawale Oguns appeals from a judgment entered following a jury trial in the United States District Court for the Eastern District of New York, Raggi, J., convicting him of importation of heroin under 21 U.S.C. § 952(a) and of possession with intent to distribute heroin under 21 U.S.C. § 841(a)(1). On this appeal we address three challenges to the district court's judgment: (1) whether evidence obtained during a search of defendant's apartment should have been suppressed because defendant's consent to search the apartment was tainted by two prior illegal entries into the apartment by government agents; (2) whether evidence of a phone call admitted at trial was inadmissible hearsay; and (3) whether the evidence presented at trial was insufficient to support the verdict.

We answer all three inquiries in the negative and we affirm.

## BACKGROUND

On May 31, 1989, United States Customs Service agents arrested Saka Adenrele at John F. Kennedy International Airport in New York, after a customs inspection revealed that he was carrying 1,405 grams of heroin in his underwear. Adenrele agreed to cooperate with the customs agents. He told the agents that he had received the heroin from a woman in Nigeria named Bola Williams, who had told him to deliver it to defendant Oguns or to Timo, Oguns' roommate. At the request of the customs agents, Adenrele placed a recorded phone call to Oguns and Timo at their address, using the phone number that Bola Williams had given him. Defendant Oguns answered the phone, and the two conversed in a Nigerian dialect. Adenrele informed the agents, who did not understand this dialect, that Oguns told him to bring the "stuff" to his address. Oguns told Adenrele that he did not have any money but that his brother Timo might have some when he returned the following day. Oguns suggested that Adenrele come to his apartment and stay for the night. Oguns also asked Adenrele to call him back one-half hour later. During the second phone conversation, which was also recorded, Oguns told Adenrele to come to his apartment in Brooklyn in an "unmarked" (non-yellow) cab.

After preparing a sample of the heroin for delivery, the agents and Adenrele drove to Oguns' apartment. Adenrele rode in a

---

* Honorable Jane A. Restani, *Judge,* United States Court of International Trade, sitting by designation.

cab driven by Agent Tsang Fong, and the other agents followed in at least three unmarked cars. En route to Oguns' apartment, Adenrele made an unrecorded phone call from a public telephone to Oguns. Oguns told Adenrele that he would be waiting outside wearing a pair of shorts. When they arrived, Oguns was sitting on the front steps of a two family house. Oguns approached the cab, gave Agent Fong $10 for Adenrele's fare, briefly spoke in the Nigerian dialect to Adenrele, and grabbed Adenrele's garment bag. Oguns and Adenrele walked toward the building together, with Adenrele carrying a tote bag which contained the heroin sample. As they neared the building, Agent Fong gave a prearranged arrest signal, and several officers arrested and handcuffed Oguns at gunpoint just outside of his apartment. Seeing an open apartment door abutting the hallway inside the apartment building, Agent Devine asked Oguns if it was his apartment. Oguns responded that it was, and several agents conducted a security sweep of the apartment, which lasted approximately two minutes. The agents did not find anyone in the apartment or seize any evidence.

While some agents apparently stayed in the apartment after the security sweep, other agents brought Oguns into his apartment and seated him on his couch. After loosening his handcuffs, Agent Devine read Oguns his *Miranda* rights in English, stopping periodically to ask Oguns if he understood what had been said. Oguns did not appear to have any difficulty understanding him. Agent Devine then read a preprinted consent to search form to Oguns. The document indicated that Oguns had the right to refuse to consent to a search and to request that a warrant be obtained, that any evidence seized could be used against him, that he could consult an attorney before deciding whether to consent, and that he could withdraw his consent at any time before the conclusion of the search. Oguns listened, read the consent form himself, and then signed the document. During the subsequent search, agents seized miscellaneous papers identifying Oguns and Timo and a number of cards and letters with Bola Williams' name written on them.

During the search of the apartment, the apartment telephone rang and Agent Gray, another member of the arrest team, answered it. The caller asked to speak to Oguns. Agent Gray told the caller that Oguns had gone to the store but indicated that he, the agent, was a friend of Oguns. The caller then asked, "Have the apples arrived there?" Evidence introduced at trial showed that narcotics traffickers often use code words when discussing drugs on the telephone.

On June 13, 1989, a grand jury indicted Oguns on three counts: conspiracy to import in excess of one kilogram of heroin, importation of in excess of one kilogram of heroin, and possession with an intent to distribute in excess of one kilogram of heroin. Oguns filed a pretrial motion to suppress statements and evidence seized from his apartment. In support of his motion, he advanced three arguments: (1) the agents lacked the requisite probable cause to arrest him; (2) he did not waive his *Miranda* rights; and (3) he did not voluntarily consent to the search of his apartment. At a suppression hearing on November 7, 1989, Judge Raggi heard testimony from Agent Devine and oral argument on behalf of the government and the defendant. She then denied Oguns' suppression motion. The judge found that the agents had probable cause to arrest Oguns. Although concerned about the effect of the presence of the agents in Oguns' apartment, Judge Raggi also found that Oguns waived his *Miranda* rights and, under the totality of circumstances, knowingly and voluntarily consented to the search. The record of the suppression hearing reveals that Judge Raggi found the security sweep to be reasonable but that she did not explicitly address the propriety of what Oguns claims was a second illegal entry, when the agents brought Oguns into his apartment after the security sweep.

On November 15, 1989, a jury convicted Oguns on the counts that charged importation of heroin and possession with intent to distribute heroin. The jury acquitted

Oguns on the conspiracy charge. On January 31, 1990, the court sentenced Oguns to 121 months imprisonment on both the distribution and importation counts, with the sentences to run concurrently, and levied against Oguns a $100 special assessment. On appeal Oguns challenges the admission of evidence seized from his apartment, the admission of out-of-court statements made during a telephone conversation at Oguns' apartment, and the sufficiency of the evidence.

## DISCUSSION

A. *Evidence Seized From Oguns' Apartment*

After Oguns consented to a search of his apartment, agents located and seized papers identifying Oguns and his brother and correspondence bearing the name Bola Williams, the alleged seller in the heroin importation scheme. Oguns argues that this evidence should have been suppressed, because his consent to search the apartment was tainted by two earlier entries that violated his Fourth Amendment rights or, alternatively, because his consent was involuntary. We agree with one of the premises of this argument but not with its conclusion.

At the outset, it bears noting that the agents did not seize any evidence during the first two entries into the Oguns apartment. We consider the propriety of these entries only as they relate to whether Oguns validly consented to the search that ultimately produced evidence used against Oguns at trial.

### 1. Security Sweep

■ In considering the legality of the first entry, we begin our analysis with the axiom that warrantless searches "are *per se* unreasonable, subject to a few well-delineated exceptions." *United States v. Vasquez,* 638 F.2d 507, 529–30 (2d Cir.1980) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)), *cert. denied,* 454 U.S. 975, 102 S.Ct. 528, 70 L.Ed.2d 396 (1981). One of these exceptions is a security sweep incident to a lawful arrest. The Supreme Court held last term that, following an in-home arrest, officers may conduct a limited security sweep of the premises if they possess a "reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie,* —— U.S. ——, 110 S.Ct. 1093, 1099–1100, 108 L.Ed.2d 276 (1990). In *Buie,* the Supreme Court applied a standard of reasonable suspicion to a security sweep conducted after an in-home arrest; the Court did not, however, address whether the same standard applies to security sweeps conducted after arrests made outside of the home.

■ In this Circuit, we have applied a standard comparable to the reasonable suspicion test announced in *Buie* in assessing security sweeps incident to arrests outside of the home. In *Vasquez,* we held that such an entry is permissible

> if the arresting officers had "(1) a reasonable belief that third persons [were] inside, and (2) a reasonable belief that the third persons [were] aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public."

638 F.2d at 531 (quoting *United States v. Agapito,* 620 F.2d 324, 336 n. 18 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980)). Although we articulated this standard before *Buie,* we think it may be read consistently with the Supreme Court's recent holding concerning security sweeps.

■ Applying this test to the agents' security sweep of the Oguns apartment, we conclude that the agents' actions did not violate Oguns' Fourth Amendment rights. The agents arrested Oguns at twilight just outside of a two family house. When the agents entered the lobby of the building, they noticed that the door to the Oguns apartment was open. Even though the agents had been told that Oguns' brother was not in the apartment, they still could have reasonably believed that others were in the apartment. The agents also could

have reasonably believed that people in the apartment saw or heard them arrest Oguns and might jeopardize the agents' safety or destroy relevant evidence. Had third parties been in the apartment, they would likely have been able to hear through the open door the agents arresting Oguns and, with that knowledge, would have posed a threat to the police outside. In view of the circumstances confronting the officers and the fact that the district court's factual findings were not clearly erroneous, we hold that the security sweep met the Fourth Amendment requirements specified in *Buie* and *Vasquez.*

### 2. Second Entry to the Apartment

The second warrantless entry into the Oguns apartment is more troublesome. Evidence produced at the suppression hearing failed to clarify whether the agents left the apartment after the security sweep and reentered with Oguns, or whether they remained in the apartment after the security sweep and "invited" Oguns in. Either characterization raises Fourth Amendment questions.

■ The agents no longer had authority to remain in Oguns' apartment after they determined that no one else was there. *See Vasquez,* 638 F.2d at 529–30 (quoting *Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041). They could not claim that exigent circumstances justified either their continued presence or their reentry without a warrant. Once police eliminate the dangers that justify a security sweep—safety of police, destruction of evidence, escape of criminals—they must, barring other exigencies, leave the residence. Were this not the rule, searches begun as minor intrusions on domestic privacy would expand beyond their legitimate purposes. This concern is particularly germane to government-citizen encounters where, as here, agents subsequently seek the resident's consent to search his domicile. We now examine what effect, if any, this illegal second entry should have on the validity of Oguns' consent to search his apartment.

### 3. Validity of Oguns' Consent

Oguns challenges the district court's finding that he consented to the search of his apartment on two grounds. He first argues that his consent was tainted by the illegal second entry into his apartment under the "fruit of the poisonous tree" doctrine articulated in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); he then argues that his consent was involuntary under *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Under *Wong Sun,* the agents' illegal entry invalidates Oguns' consent unless "the taint of the initial entry had been dissipated before the 'consents' to search were given." *Vasquez,* 638 F.2d at 527. The government bears the burden of proving that the taint has been alleviated. *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975); *United States v. Ceballos,* 812 F.2d 42, 50 (2d Cir.1987). The government must show that the consent " 'was sufficiently an act of free will to purge the primary taint of the unlawful invasion.' " *Brown,* 422 U.S. at 599, 95 S.Ct. at 2259 (quoting *Wong Sun,* 371 U.S. at 486, 83 S.Ct. at 416–17).

■ In assessing whether the taint of the illegal entry was sufficiently diminished, we consider four factors: whether a *Miranda* warning was given, the "temporal proximity" of the illegal entry and the alleged consent, "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct." *Brown,* 422 U.S. at 603–04, 95 S.Ct. at 2261–62; *Ceballos,* 812 F.2d at 50. The record shows that Agent Devine deliberately read Oguns his *Miranda* rights, stopping after each right to ensure that Oguns understood. As to the temporal proximity factor, the short lapse of time between the illegal entry and consent, amounting only to a few minutes, did little to dissipate the taint of the illegal entry. Within this short period of time, however, the agents read to Oguns a consent to search form, indicating Oguns' right to re-

fuse to consent to a search.[1] Oguns reread the form himself and then signed it. Through this intervening act, the agents effectively advised Oguns of his Fourth Amendment rights, something that *Miranda* warnings alone would not fully accomplish. Even though the agents were in Oguns' apartment when they read him these rights, the record is clear that the agents did not seize any evidence until after Oguns consented to a search. Finally, the agents' conduct was not flagrantly illegal or fraught with evil purpose. Nothing in the record indicates that their actions in remaining after the lawful sweep or reentering with Oguns after the lawful arrest were taken in bad faith. The Fourth Amendment permitted them to be in Oguns' apartment initially; it just did not permit them to stay there. The appropriateness of the first entry, under these circumstances, and of the lawful arrest had the effect of mitigating the egregiousness of the second illegal entry. We conclude that the government satisfied its burden of showing that the taint of the illegal entry was dissipated before Oguns consented to the search of his apartment.

▮▮▮ Turning to Oguns' second challenge, we now consider whether Oguns voluntarily consented to the search of his apartment. At the suppression hearing, the district court carefully considered the context of Oguns' consent and found it to be voluntary. The question whether a defendant's consent issued voluntarily requires consideration of the "totality of all the circumstances." *Bustamonte*, 412 U.S. at 227, 93 S.Ct. at 2048. Viewing a defendant's consent in the context of all the surrounding circumstances, a court must determine "whether the consent was the product of an essentially free and unconstrained choice by its maker." *United States v. Arango–Correa*, 851 F.2d 54, 57 (2d Cir.1988) (citing *Bustamonte*, 412 U.S. at 225, 93 S.Ct. at 2046–47). Oguns argues

that his will was overborne primarily because he was in custody, he was a foreigner, and the officers were already in his apartment, making his consent seem superfluous. Other factors, however, more than compensate for these concerns. The district court found that Oguns was thirty-four years old, spoke and understood English, had been in this country for four to five months prior to the arrest, and most importantly, was carefully informed of his *Miranda* rights and his right to refuse to consent to the search. The search also was not a *fait accompli;* the agents did not seize any evidence until after Oguns gave his consent. Given the district judge's ability to evaluate the credibility of the agent who obtained Oguns' consent, we conclude that the district judge's finding that Oguns voluntarily consented to the search was not clearly erroneous. *United States v. Puglisi*, 790 F.2d 240, 244 (2d Cir.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986); *see also Arango–Correa*, 851 F.2d at 57.

### B. *Evidence of Unidentified Phone Call to Oguns' Apartment*

▮▮▮ Oguns contends that evidence of a question asked during a phone call to his apartment was hearsay and was improperly admitted as a co-conspirator statement under Rule 801(d)(2)(E) of the Federal Rules of Evidence. We disagree. While the agents were searching the Oguns apartment, Agent Gray answered a phone call. During the course of the ensuing conversation, the unidentified caller asked, "Have the apples arrived there?" The court properly admitted this evidence. Contrary to Oguns' contention, the court admitted this question not as a co-conspirator statement, but as non-hearsay circumstantial evidence of Oguns' knowledge and intent. After the government presented evidence of the phone call, the judge advised the jury that the evidence was sub-

---

**1.** The agents lost the consent form that Oguns signed. At the suppression hearing, however, the court admitted a copy of the form that the agents read to Oguns. The form indicates not only that the defendant has a right to refuse to consent to a search and demand a warrant, but

also advises him that any items found can be used against him, he may consult an attorney before or during the search, and he may withdraw his consent to search at any time prior to its conclusion.

mitted "not for the truth of what was said but simply as evidence that such a statement was made to Agent Gray."

We agree with the court that the hearsay rule does not bar admission of this question. "An inquiry is not an 'assertion,' and accordingly is not and cannot be a hearsay statement." *Inc. Pub. Corp. v. Manhattan Magazine, Inc.,* 616 F.Supp. 370, 388 (S.D.N.Y.1985), *aff'd,* 788 F.2d 3 (2d Cir. 1986). Because a question cannot be used to show the truth of the matter asserted, the dangers necessitating the hearsay rule are not present. *See United States v. Detrich,* 865 F.2d 17, 20–21 (2d Cir.1988). The lack of identity of the caller, moreover, does not render the call inadmissible. *See United States v. Saavedra,* 684 F.2d 1293, 1298 (9th Cir.1982). The government legitimately used the phone call as circumstantial evidence of Oguns' knowledge and intent regarding the importation and distribution charges. *See e.g., United States v. Pedroza,* 750 F.2d 187, 200 (2d Cir.1984). The fact that an out-of-court statement is used to provide circumstantial evidence of a conspiracy does not require that the statement be analyzed under the co-conspirator exception to the hearsay rule. Since the statement in this case was not offered to prove the truth of the matter asserted, we need not reach the question whether the statement falls within the co-conspirator exception. *Saavedra,* 684 F.2d at 1298.

### C. *Sufficiency of the Evidence*

■■■ A defendant challenging the sufficiency of the evidence to support his conviction carries a heavy burden. *United States v. Khan,* 787 F.2d 28, 33 (2d Cir. 1986). The test is whether, viewing the evidence in the light most favorable to the government, *id.,* sufficient evidence existed for a rational trier of fact to find the elements of the two crimes beyond a reasonable doubt. *United States v. Nusraty,* 867 F.2d 759, 762 (2d Cir.1989). The jury may base its verdict entirely on inferences from circumstantial evidence, *United States v. Mariani,* 725 F.2d 862, 865–66 (2d Cir. 1984), and the evidence " 'need not have excluded every possible hypothesis of inno-

cence.' " *United States v. Tyler,* 758 F.2d 66, 68 (2d Cir.1985) (quoting *United States v. Soto,* 716 F.2d 989, 993 (2d Cir.1983)).

■■ In assessing the importation and possession charges, we note that nothing in the record indicates that Oguns ever actually took possession of the heroin. When Adenrele arrived at Oguns' apartment, Oguns grabbed Adenrele's garment bag and proceeded with Adenrele towards the building. The agents had placed the heroin in a tote bag, which Oguns never actually possessed. Nevertheless, the convictions may be affirmed if sufficient evidence showed that Oguns aided and abetted a principal involved in the same charges. *Nusraty,* 867 F.2d at 766. To convict under an accomplice theory, the government must show, among other things, that " 'the person charged joined the venture, shared in it, and that his efforts contributed towards its success.' " *Id.* (quoting *United States v. Aiello,* 864 F.2d 257, 263 (2d Cir.1988)). The defendant must have "furthered" the criminal acts and "known" the crimes were to be committed. *Id.*

■■ The government produced sufficient evidence at trial for a rational jury to find beyond a reasonable doubt that Oguns knew of the importation and distribution schemes and sought to advance them. As to the importation conviction, the two recorded telephone conversations between Oguns and Adenrele showed Oguns' knowledge of the importation plan, as did the instruction from the seller, Bola Williams, directing Adenrele to contact Oguns upon arriving in New York. By inviting Adenrele to his apartment to stay for the night until the money arrived and by paying for Adenrele's cab fare, Oguns also assisted the importation of the heroin. There is no merit to Oguns' argument that he could not be convicted of importation because the importation crime was completed when Adenrele was arrested. The intended recipient of imported narcotics can be convicted for aiding and abetting their importation. *See, e.g., United States v. Adegbite,* 877 F.2d 174 (2d Cir.), *cert. denied sub*

nom. *Obalaja v. United States,* — U.S. ——, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989).

■ This evidence also established Oguns' role as an accomplice to the crime of possession of heroin with intent to distribute it. From the two telephone conversations, the jury could infer that Oguns knew Adenrele possessed heroin. His subsequent invitation to Adenrele, and offer to pay for the heroin the following day, suggest that he planned to help the distribution efforts. The correspondence bearing Bola Williams' name, as well as the phone call inquiring about the arrival of "apples," provided additional evidence that Oguns aided and abetted the distribution of heroin.

We disagree with Oguns' contention that our holding in *Nusraty* requires a different result. In *Nusraty* we dismissed for insufficient evidence convictions for possession with intent to distribute, conspiracy and importation. But the evidence adduced in that case differed considerably from the evidence implicating Oguns. In *Nusraty,* the defendant met the drug courier in a public place (an airport), refused to accept the drugs (contained in a suit) after briefly conversing with the courier, and then walked away from him. Here, Oguns spoke on three occasions to the drug courier by telephone, then invited the courier to come to his home, and, upon his arrival, paid for his cab fare, grabbed his garment bag, and proceeded up the walk toward his apartment. In sum, Oguns exercised a "purposive attitude" towards the criminal venture, one sufficient to convict him of aiding and abetting it. *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir.1938).

### CONCLUSION

For the above reasons, we affirm the district court's judgment of conviction.