UNITED STATES of America

v.

**Juan Reynaldo CORDOVA.**

**Criminal Action No. 1:09–CR–475–WSD–CCH–5.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Dec. 17, 2010.

Jeffrey Aaron Brown, U.S. Attorney's Office, Paul Rhinehart Jones, Office of United States Attorney, Atlanta, GA, for United States of America.

## ORDER AND OPINION

WILLIAM S. DUFFEY, JR., District Judge.

This Opinion and Order addresses for the second time Magistrate Judge C. Christopher Hagy's Report and Recommendation ("R & R") [99] on Defendant Juan Reynaldo Cordova's ("Cordova" or "Defendant") Motion to Suppress Statements [40], Motion to Suppress Evidence [41] ("Motion to Suppress"), and Motion to Dismiss Indictment for Violation of the Double Jeopardy Clause of the Fifth Amendment [43] ("Motion to Dismiss").

On February 3, 2010, the Magistrate Judge conducted an evidentiary hearing on the motions and recommended that each of the motions be denied. Cordova objected to the Magistrate Judge's recommendation to deny his motion to suppress evidence seized during searches occurring on March 26, 2009, and to the recommendation to deny his motion to dismiss based on a claim of double jeopardy.

The first Order and Opinion [110], entered on September 10, 2010, disposed of several issues relating to the R & R. First, the order noted Cordova's withdrawal of his Motion to Suppress Statements and his motion to suppress evidence seized during the March 21, 2009, search. Based on the withdrawal, those motions were denied as moot. Second, the order denied as moot Cordova's motion to suppress evidence

seized during the October 28–29, 2009, search because the government represented that it will not seek to introduce evidence from that search. Finally, after its plain error review, this Court adopted the R & R's factual findings.

What remains is Cordova's motion to suppress evidence obtained during the March 26, 2009, searches and his motion to dismiss the indictment on double jeopardy grounds. The first Order and Opinion discussed the law relating to the first search of March 26, 2009, a "protective sweep" of Cordova's bedroom, but determined that the facts regarding the search required further development. The Court therefore conducted an evidentiary hearing on September 23, 2010. Following the hearing, the Government and Defendant submitted their additional briefing[1] on the matter and the Court now addresses Defendant's suppression and double jeopardy motions.

## I. BACKGROUND

In early 2009, Gwinnett County law enforcement officials were investigating a series of local convenience store armed robberies. As part of this investigation an official from Gwinnett County sent a broadcast email to other law enforcement agencies in the area seeking information about and assistance in the robbery investigation. Special Agent Jason Tyler of the United States Immigration and Customs Enforcement ("ICE") received the email.

Agent Tyler works with the ICE Atlanta Gang Unit investigating federal crimes involving transnational gangs. As part of his duties, Agent Tyler investigates the activities of a group known as MS–13, a street gang comprised of individuals from Central America and Mexico. When he reviewed the broadcast email that was sent by Gwinnett County, and pictures of

the robbery suspects attached to it, he recognized two of the suspects. He responded to the broadcast email and began cooperating with Gwinnett County law enforcement's investigation of the robberies, including by sharing information he had developed in his MS–13 investigation. The Gwinnett County armed robbery investigation was distinct and separate from the federal MS–13 investigation, and Agent Tyler's participation in the robbery investigation was limited to a supporting role.

On March 26, 2009, Gwinnett County officials executed arrest warrants for Alden Onan Espana and Francisco Tejada–Landaverde, co-defendants in this action. Because the arrests were facilitated by information from the federal MS–13 investigation, Agent Tyler participated in them. He knew, however, based on information developed in Gwinnett County's investigation, that at least four people were involved in the armed robbery for which Espana and Tejada–Landaverde were arrested.

Agent Tyler had encountered Espana and Tejada–Landaverde outside a restaurant five days before they were arrested on March 26, 2009. When Agent Tyler encountered them, Espana and Tejada–Landaverde were with Cordova and another co-defendant in this matter, Jose Roberto Salazar–Orellana. At the restaurant, Cordova and the others had consented to Agent Tyler photographing them and they each gave Agent Tyler their current address information.

While Gwinnett County authorities took Espana and Tejada–Landaverde to the police station for questioning after the March 26, 2009, arrests, Agent Tyler and two Gwinnett County police officers decided, using the addresses Agent Tyler had ob-

---

1. The Court ordered simultaneous briefing on the matter to be submitted by October 29, 2010. Defendant submitted a brief on October 29 and the government submitted a responsive brief on November 2.

tained several days earlier, to try to speak with Cordova and Salazar–Orellana about the robberies. The agents and officers first went to the address given by Salazar–Orellana. When they could not contact him they went to the address given by Cordova.

Early in the evening on March 26, 2009, Agent Tyler, ICE Special Agent Ledgerwood, another ICE agent, and two Gwinnett County police officers arrived at the address Cordova had given. The address was a small, two-story single-family house located at the end of a driveway. The driveway led to a single car garage, and there was a walkway from the driveway to the side of the house where the front door was located. The agents and officers knocked on the front door and spoke with the two women who opened it. The women indicated that Cordova was not home and the agents began walking down the driveway to the street. While walking away, Cordova ran down the driveway asking if the agents were looking for him. The agents said that they were and they asked if they could talk to Cordova inside the house. Cordova responded, "sure, no problem." When this exchange occurred, Cordova and the agents were standing in the driveway. The group was approximately 20 feet away from the front entrance of the house. As they turned to walk back towards the front door of the house, a woman, visibly pregnant and identified as Marisol, started walking from the front door towards the group. She was about ten feet from them and ten feet from the home when Cordova, in Spanish, said to her under his breath in an excited manner to "take out the bag [or backpack]."[2] Marisol turned and, in a quick pace, began walking toward the house. Agents Tyler

and Ledgerwood saw Marisol do this, quickly spoke with each other to confirm that they both understood Cordova to have said to take out the bag or backpack, and they, in a quick pace, but short of running, tried to catch up with Marisol, When they began following Marisol, Agent Tyler understood the comment made by Cordova about the bag to refer to possible contraband, and he believed Marisol intended to tamper with, destroy, move or hide possible evidence in the robbery investigation. Agent Ledgerwood was motivated by this same reason, and by his concern that, because the crime they were investigating involved weapons and MS–13 was known to be a violent gang, she might be retrieving a weapon that could endanger the agents.

Agent Ledgerwood was the first to enter the home after Marisol.[3] Just inside the doorway was a set of stairs leading to the second floor. As Agent Ledgerwood entered Marisol was already near the top of the stairs, telling a man at the top of the stairs to take out the bag. When he failed to respond she rushed past him and into a bedroom. Agent Ledgerwood immediately went up the stairs and followed Marisol down the hallway and into the bedroom Marisol had entered. When he did he saw Marisol retrieve a small pink backpack from the closet and start opening it. He pushed her away from the backpack and tossed it on the floor. As he asked her why she had rushed upstairs he looked down and saw a gun handle through an opening in the bag. Agent Tyler then entered the room. Agents Ledgerwood and Tyler called for a third officer to come upstairs to remove the gun from the bag. This third officer discovered that the gun was loaded.

---

**2.** The Spanish term used may mean either "bag" or "backpack."

**3.** Agent Ledgerwood stated: "If I did not have consent [to conduct the interview in the home], I probably would not [have entered the house], but I would move agents away from the driveway to stay out of danger ... out of harm's way...."

Cordova entered the bedroom next. He was not arrested or handcuffed. In response to an officer's question, Cordova said there were no other weapons in the home, and he agreed to the officer's request to look around the bedroom. The agents searched the room and in it discovered a case of Modella beer, which was one of brands that had been reported stolen during the robberies, some cigarettes, and a hooded sweatshirt with a distinctive design that Agent Tyler recognized from one of the photographs taken from the armed robbery surveillance videos. Cordova agreed to allow the agents to take these items.

Agent Tyler indicated in his report that he asked for and received from Cordova verbal consent to search an iPhone, digital camera, and cell phone that the agents found during their search of the bedroom. Agent Tyler testified that requesting consent for these kinds of devices was his typical practice, but that he did not specifically remember when or whether consent was given. Cordova assisted the agents in their search of the electronic devices and he attempted to find a cord that would allow Agent Tyler to copy the photos from the camera to a computer.

One of the Gwinnett County officers then asked Cordova to come to the Gwinnett County Police Department for questioning and Cordova agreed. Agent Tyler went with them and observed the interview of Cordova conducted by Gwinnett County law enforcement personnel. He did not participate in the interview. He had only a limited, coordination role in the investigation after March 26, 2009.

On October 28, 2009, Cordova was arrested on the federal indictment that is the subject of this action. Gwinnett County also indicted Cordova for one of the armed robberies under investigation, relying, in part, on the evidence and information provided by Agents Tyler and Ledgerwood, including evidence seized from the March 26, 2009, searches. The decision to prosecute Cordova on state charges was made independently by Gwinnett County authorities. Cordova was allowed to plead guilty in Gwinnett County to a misdemeanor charge of possession of stolen property.

## II. STANDARD OF REVIEW

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1); Fed.R.Crim.P. 59; *Williams v. Wainwright,* 681 F.2d 732, 732 (11th Cir.1982), *cert. denied,* 459 U.S. 1112, 103 S.Ct. 744, 74 L.Ed.2d 964 (1983). Because this order and opinion is limited to Defendant's remaining objections to the Magistrate Judge's recommendations, the standard of review is *de novo.* 28 U.S.C. § 636(b)(1).

## III. DISCUSSION

Cordova objects to the recommendation to deny his motion to suppress the evidence seized during the March 26, 2009, searches and to deny his motion to dismiss based upon the Double Jeopardy Clause of the Fifth Amendment. The Court considers first his Motion to Suppress.

### A. *The Motion To Suppress*

The agents conducted three separate searches on March 26, 2009: The initial protective sweep of the bedroom that Marisol entered,[4] the second consent-based search of the bedroom, and the final con-

---

4. The Government argued to the Magistrate Judge that when Cordova consented to speak with the agents inside the home he also consented to their entry into the bedroom. The Magistrate Judge found that the evidence in the record does not support that consent to search was given and the Government did not challenge that finding. This Court found no

sent-based search of the electrical devices found in the bedroom. The protective sweep is the foundational search, which led to the second and third consent searches.

### 1. The "Protective Sweep" of Cordova's Bedroom

The government argues that the initial warrantless search of Cordova's bedroom was authorized under the "protective sweep" doctrine announced in *Maryland v. Buie*, 494 U.S. 325, 334–35, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Specifically, the Government argues that because Defendant stated it would be "no problem" to be interviewed in his home he had consented to their entry and as a result of Cordova's comment to Marisol and her response to it, under *Buie*, agents were authorized to conduct a search of the upstairs bedroom in which Marisol entered.[5]

■■■■■ According to *Buie*, law enforcement officials may, "as an incident to the arrest," conduct a "cursory inspection of those spaces where a person may be found" if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.*[6] The search may "extend only to a cursory inspection of those spaces where a person may be found," and may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises."

*Id.* at 335–36, 110 S.Ct. 1093, The Court stressed that "[a] protective sweep is without question a 'search' ... [and] they are permissible on less than probable cause only because they are limited to that which is necessary to protect the safety of officers and others." *Id.* at 336 n. 3, 110 S.Ct. 1093.

*Buie*'s holding was based on two foundational facts: the execution of an arrest warrant and the officers' presence inside the home. The search of the immediate vicinity and the broader sweep based on articulable facts and inferences that a person is in other areas are allowed because law enforcement officials, in effecting an arrest in a home, are entitled to protect themselves from danger. Courts have used the reasoning of *Buie* to authorize protective sweeps in a limited number of circumstances beyond *Buie*'s core facts. From *Buie* and the courts that have interpreted it, the Court seeks to determine if the search here was constitutionally permitted.

### a) The Expansion Of *Buie* To Non–Arrest Situations

Various courts have allowed warrantless *Buie* protective sweeps of homes in certain limited situations where presence in the home was other than to make an arrest. *See United States v. Miller*, 430 F.3d 93, 99 (2d Cir.2005) (noting majority rule and collecting cases). *But see United States v. Davis*, 290 F.3d 1239, 1242 n. 4 (10th Cir. 2002) (limiting *Buie* to the context of arrests inside a home). Where law enforce-

---

plain error in the Magistrate Judge's conclusion that consent to search was not given.

**5.** The Government stated the issue this way: "the issue before this Court is whether the reasoning applied in *Buie* and later cases extending [sic] protective sweep doctrine to instances where law enforcement are lawfully in a home by consent should be applied to the facts in the instant case." Post–Hearing Br. at 1.

**6.** *Buie* also allows law enforcement officials to search "spaces immediately adjoining the place of arrest from which an attack could be immediately launched" without probable cause or even reasonable suspicion, *id.* at 334, 110 S.Ct. 1093, but that aspect of *Buie* is not relevant here.

ment officials are in a house to respond to exigent circumstances such as a possible ongoing burglary, *see Leaf v. Shelnutt,* 400 F.3d 1070, 1074–75, 1086 (7th Cir.2005), to remove a child from danger, *see United States v. Martins,* 413 F.3d 139, 148 (1st Cir.2005), to carry out a search warrant in another part of the home, *see United States v. Daoust,* 916 F.2d 757, 759 (1st Cir.1990) (Breyer, J.), and to serve an order of protection, *see United States v. Miller,* 430 F.3d 93, 96, 99–100 (2d Cir. 2005), *Buie* protective sweeps have been allowed.[7]

The reasoning of the courts that allow *Buie* protective sweeps where an arrest is not being made is sound and persuasive. *Buie* recognized the risk of danger during "the serious step of taking a person into custody for the purpose of prosecuting him for a crime." 494 U.S. at 333, 110 S.Ct. 1093. Authorizing a *Buie* sweep when law enforcement officials are lawfully present in a home because of exigent circumstances or some other authorized function should allow such officials to protect themselves just as officials may protect themselves when effecting an arrest.

 Courts also have allowed *Buie* protective sweeps when law enforcement is in a home with the permission of an occupant because the concerns are the same. Officials in an unfamiliar setting that are conducting investigative activity, such as an interview, should be entitled to protect themselves from danger of injury. Courts, however, have carefully scrutinized *Buie* searches where presence in a home is based on consent because of the possibility that consent may be requested as a pretext to engage in protective sweeps for investigation and evidence gathering pur-

poses. The purpose for requesting consent is, in whole or in part, necessarily subjective. Because pretext is possible, sweeps pursuant to presence by consent should be closely evaluated and the sweep protocol announced in *Buie* should be strictly applied. The risk of pretext is significantly minimized if courts require law enforcement to show "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie,* 494 U.S. at 334, 110 S.Ct. 1093. These articulable facts, by the express language of *Buie,* must be perceived once law enforcement is "on the . . . scene," that is once they are in the house. That is because it is the presence of law enforcement officials in unfamiliar ground that justifies the search *if* the facts and inferences support that a danger to them may exist. *See, e.g., United States v. Gould,* 364 F.3d 578, 589 (5th Cir.2004) (noting that concerns would arise if a protective sweep occurred "*without* anything having developed since entry suggestive of greater or more imminent danger than that initially apparent just prior to entry"); *cf. United States v. Tobin,* 923 F.2d 1506, 1511 (11th Cir.1991) (stating that in the Eleventh Circuit warrantless searches are illegal where police have probable cause but instead of obtaining a warrant they create exigent circumstances).

The unpublished Eleventh Circuit decision in *Legette* illustrates this careful application of *Buie* in a consent context. In *Legette.* law enforcement officers conducted a protective sweep after they entered the defendant's home with his consent.

---

7. No published Eleventh Circuit cases apply *Buie* in similar circumstances, but the Court concludes that protective sweeps under similar circumstances would be permitted in our circuit. *See United States v. Legette,* 260 Fed. Appx. 247, 249–50 (11th Cir.2008) (allowing *Buie* sweep where officials were in home by consent but were securing premises in anticipation of a search warrant).

The court upheld the protective sweep because, after the officers entered the house, the defendant became "highly agitated" and started pacing towards the bathroom door and bedroom door, which "made the officers wary that others might be present in the house." *Legette*, 260 Fed.Appx. at 248. The officers, who had probable cause to search the apartment but did not yet have a search warrant, secured the premises after the protective sweep was conducted but waited until the warrant was issued before conducting the full search. *Id.* *Legette* is simply a case where the officers entered a home with the occupant's consent and once on the premises articulable facts disclosed a potential danger that justified a *Buie* sweep, but where, however, a search of the home was withheld until a warrant was issued.

*Buie* protective sweeps have been upheld in other similar circumstances where law enforcement was present with the consent of the occupant and after entry perceived articulable facts and inferences from them that led to the reasonable belief that someone presented a danger. *See, e.g., United States v. Scroggins*, 599 F.3d 433, 438, 445 (5th Cir.2010) (after arresting woman on her porch and granting her request to enter her home so she could change clothes, they encountered a man suspected of murder and performed a protective sweep when he ducked into the bedroom and ignored their call for him to halt); *Gould*, 364 F.3d at 580 (after roommate who granted entry said that other roommate, suspected of plotting to kill two local judges, was asleep in bedroom, law enforcement conducted protective sweep because they saw through open bedroom door that roommate was not in his bed).[8]

To summarize, courts have expanded *Buie* to allow protective sweeps where law enforcement officers are performing a law enforcement duty inside an individual's residence, including by consent. These courts, however, each noted that articulable facts and inferences of danger were perceived after entry and allowed *Buie* sweeps only because the sweep protocol prescribed by *Buie* was strictly observed.[9]

---

**8.** These cases comply with the requirement alluded to in *Gould* that the facts creating the reasonable suspicion of danger arise after entry into the home. The Court notes that *United States v. Garcia* allowed a broad protective sweep after officers were given consent to enter a home. 997 F.2d at 1282. There, as soon as occupant allowed law enforcement to enter his home, they pushed him against a wall, asked him if others were inside the residence, then handcuffed both him and the other person in the residence while they performed a protective sweep. *Id.* *Garcia* appears to be an outlier and, in a more recent decision, *see United States v. Reid*, 226 F.3d 1020, 1022 (9th Cir.2000), the Ninth Circuit held that a protective sweep after consent entry was not authorized because there was no arrest, which suggests the Ninth Circuit now strictly applies *Buie*. The D.C. Circuit also upheld a *Buie* sweep where law enforcement entered an apartment with the lessee's consent and performed a protective sweep of the defendant's bedroom based only on facts known prior to entering the apartment. *Unit-*

*ed States v. Patrick*, 959 F.2d 991, 994 (D.C.Cir.1992). That was an unusual situation where the lessee gave consent to search because the defendant had moved into the apartment without permission and was keeping drugs and weapons there against the lessee's wishes.

**9.** Courts have on rare occasion permitted protective sweeps of homes when Defendants are arrested outside the home but then taken inside of a home. To the extent this has been allowed, the circumstances are such that the Court essentially views the arrests as occurring inside the home because the arrest is made at the building perimeter. For example, courts have considered an arrest as in-home and allowed a *Buie* search when the arrest occurs just outside the door or when a defendant is in the process of entering or exiting. *See, e.g., United States v. Cavely*, 318 F.3d 987, 996 (10th Cir.2003) (defendant arrested "just outside of the back door"); *United States v. Wilson*, 306 F.3d 231 (5th Cir. 2002), *overruled on other grounds by United*

### b) Applying *Buie* To The Current Case

Having surveyed the post-*Buie* decisions the Court finds that *Buie* searches are permissible where officers are present in a home with the consent of an occupant and, once there in unfamiliar surroundings, perceive "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie,* 494 U.S. at 334, 110 S.Ct. 1093. *Buie* sweeps are allowed, if at all, only in accordance with *Buie*'s terms. That is, a protective sweep beyond the immediate area is allowed only if there are articulable facts and inferences from them that someone in another area of the home presents a danger to officers in the house. A sweep is allowed only after entry into the house or at least very near the home entry because only then are they on unfamiliar grounds and only then can investigating officers evaluate whether a sweep is allowed and, if so, according to what scope it may be conducted.

The question before the Court now is whether *Buie* authorizes the protective sweep conducted here. The law enforcement officers were not in close proximity to Cordova's residence. They were twenty feet from the entrance of the home, in the driveway speaking with a cooperating occupant. It was the agents who asked to speak in the Defendant's home, and Defendant agreed. But it was events occurring some twenty feet outside the home that caused officers to rush into unknown, unfamiliar, and confined surroundings. Their conduct violates the principle of *Buie*—a limited warrantless search exception that allows law enforcement officers to protect themselves when they are required to enter an unknown area to confront dangers they cannot perceive. What *Buie* says is that where officers are performing their duties in unfamiliar surroundings they are allowed to take reasonable steps to protect themselves. What is reasonable is determined once they are on the premises and what they can do is based on articulable facts they perceive once they are in the unfamiliar, confined setting.

Here, the agents elected to subject themselves to an unknown danger they could have avoided by not rushing into the residence. The government argues that we should accept the agents' judgment that rushing into the unknown surroundings of a suspected gang member's home was a safer course of conduct than moving away from the home, but *Buie* simply does

States v. Gould, 364 F.3d 578, 586 (5th Cir. 2004) (arrest made just outside the open door of the apartment); *United States v. Henry,* 48 F.3d 1282, 1284 (D.C.Cir.1995) (arrest occurred "just outside the open door"); *United States v. Oguns,* 921 F.2d 442, 445 (2d Cir. 1990) (arrest occurred "just outside" defendant's open apartment door); *United States v. Burgos,* 720 F.2d 1520, 1523 (11th Cir.1983) (pre-*Buie* case upholding protective sweep after an arrest occurred "[a] s appellant was exiting the house, leaving the front door partially open"); *McGeehan v. Wainwright,* 526 F.2d 397, 399 (5th Cir.1976) (pre-*Buie* case upholding protective sweep where individuals were arrested as they emerged from a trailer). In *United States v. Tobin,* agents conducted a protective sweep of a house after arresting the defendant in the attached garage. 923 F.2d 1506, 1513 (11th Cir.1991) (en banc). The opinion does not treat these two areas of the home as distinct or different. *See id.* (saying that because entry into house was justified the search of the garage was also permissible). At least for the purposes of *Tobin,* the garage was part of the house; it was also a "confined setting of unknown configuration." *Buie,* 494 U.S. at 333, 110 S.Ct. 1093. A careful review of these cases shows that they each presented officers with the same "disadvantage of being on his adversary's 'turf' " in a "confined setting of unknown configuration," *Buie,* 494 U.S. at 333, 110 S.Ct. 1093, as if they were within the walls of the structure.

not apply here to justify the warrantless search conducted.[10] Marisol's entry to get the bag suggested the possibility that a danger may later be presented.[11] The response, however, was not to enter the house, but to retreat if a danger was perceived. Agent Ledgerwood's split-second judgment that it was safer to enter the home, assuming it was valid, will not be second-guessed by the Court, but it also cannot be used to justify the warrantless search that was conducted.[12]

Finally, the Court notes that Agent Ledgerwood stated that he entered the home to follow Marisol because he had "consent" from the Defendant.[13] Agent Ledgerwood candidly testified that absent consent he would have withdrawn from the scene to avoid any danger to him and those with him. *Buie* allows a law enforcement official to respond to threats once in a home. If a danger is perceived outside of it, other action to protect law enforcement is required.

The precedent the Government requests be established here would risk constitutional violations in fact and would be practically and legally unmanageable. If, after all, being in the general vicinity of a home is enough to allow the warrantless search when an officer has consent to enter the home in the future, why not simply allow a protective sweep of a home anytime law enforcement perceives a danger may be

---

**10.** That the agents' driving concern upon entry was the possibility of the destruction of evidence further supports that *Buie* does not apply.

**11.** The Court has considered the reasoning of the Fifth Circuit in *United States v. Wilson*, 306 F.3d 231. In *Wilson*, the Court found that "exigent circumstances" attended the arrest of the resident, Jackson, just outside his apartment. Jackson was known to have had a gun when he committed, with an accomplice, an assault two days earlier. Jackson told officers someone else was in the home, and officers did not know if it was the accomplice or one of Jackson's eight children. The facts in this case are distinctly different from those in *Wilson*. The Court also determines there is no general "exigent circumstances" exception to *Buie* that would allow a *Buie* search when officers are in a driveway, 20 feet from the entrance of a home, and some conduct causes them to perceive some possible danger created by a person entering the home. Moreover, the Government has not argued exigent circumstances. It instead has argued they had consent to enter the home and that this consent authorized a *Buie* sweep. Finally, because the officers in *Wilson* were at the perimeter of the structure and "nothing but an open door stood between the officers . . . and harm's way," *id.* at 239, the decision there is consistent with those other courts who allow *Buie* searches when officers are in such close proximity to the home interior that they are subject to the interior and any risks in it, especially when they are next to an open door.

**12.** The Government appears to argue that because the agents had consent to enter the home in the immediate future that this "consent to interview in the home" authorized the search that was conducted. The Government also appears to argue that if the Defendant made his "get the bag" comment once they were in the house and Marisol rushed upstairs, then a sweep would have been warranted. What would have happened in the house is, of course, speculation and conjecture. *Buie* and the courts that have extended its application, ever so slightly, observe and enforce a brighter line test than that urged by the Government. If a warrantless search of a person's home is going to be allowed under *Buie*, the test and criteria announced by *Buie* must be met.

**13.** The Government's consent argument fails because the consent given was limited to conducting a discussion. The agents here entered the home not to conduct an interview but to conduct a search. *See United States v. Strickland*, 902 F.2d 937, 941 (11th Cir.1990) ("A consensual search is confined to the terms of its authorization."). Defendant did not consent to a search and certainly did not consent to a search of an area where the interview was not intended to be conducted and where Defendant did not consent to agents entering.

present in the house? What if someone several miles from their home grants consent to an in-home interview and the law enforcement official calls ahead to other officers parked at the home, who see furtive activity in the home? Would they now be allowed to enter the home to conduct a *Buie* sweep? The *Buie* line of cases is premised on the idea that a sweep is reasonable when presence in an unfamiliar setting is authorized and, once there, a danger reasonably is perceived that allows law enforcement personnel to sweep the home to protect against someone that may present a danger to them.

 "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.'" *United States v. Santa,* 236 F.3d 662, 675 (11th Cir.2000) (quoting *Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). *Buie* provides an additional exception to the warrant requirement only because of the unique vulnerability of law enforcement officials who, in the performance of their duties, must enter unknown and confined settings. To sustain an exception to the warrant requirement here, to allow entry from twenty feet away from the home based on a perceived belief that Defendant's consent allowed them to enter the home, would create a new and troublingly broad exception to the warrant requirement. The Fourth Amendment's "firm line at the entrance to the house" would be dramatically weakened.

 Under the facts present here, where law enforcement officials are in the driveway of a voluntarily cooperating individual twenty feet from the entrance of the house, *Buie* does not authorize them to rush inside the home and perform a protective search of that individual's upstairs bedroom, notwithstanding the individual's consent for them to enter the house to conduct an interview. The Court concludes, on the facts of this case, that the initial warrantless search of the bedroom was not authorized and the evidence discovered as a result of that search must be suppressed.[14]

### 2. The Subsequent Consent–Based Searches Of Cordova's Bedroom And Electrical Devices

Immediately after the unauthorized protective sweep of the bedroom, Cordova consented to the second search—of the bedroom—and the third search—of the electrical devices found during the second search. This Court addresses whether the first unauthorized search tainted the second and third searches and, if the second search was unauthorized, whether the second search tainted the third search.

 In this Circuit, a court must "conduct two separate inquiries where a consent to search follows prior illegal activity by the police." *United States v. Delancy,* 502 F.3d 1297, 1308 (11th Cir. 2007). "First, a court must determine whether the consent was voluntary. Second, the court must determine whether the consent, even if voluntary, requires exclusion of the evidence found during the search because it was the 'fruit of the poisonous tree'—the product of an illegal entry." *Id.* The Court focuses on the sec-

---

**14.** The Government does not argue that any other exception might justify the first warrantless search of Cordova's bedroom. The warrant requirement may be excused where law enforcement officials have probable cause for a search warrant but, because of an emergency situation, "there is a compelling need for official action and no time to secure a warrant." *United States v. $291,828.00 In U.S. Currency,* 536 F.3d 1234, 1237 (11th Cir. 2008). It is doubtful under these facts that probable cause existed to search the bedroom and this may explain why the Government has not advanced this argument.

ond requirement. The question here is not whether the evidence in question would not have been found "but for" the illegal activity. *Id.* at 1309. " 'Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " *Id.* (quoting *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). The Government bears the burden of proving that the consent was untainted by the initial illegal search.

 Three nonexclusive factors guide whether the illegal search taints the consent: "[1] the temporal proximity of the seizure and the consent, [2] the presence of intervening circumstances, and, particularly, [3] the purpose and flagrancy of the official misconduct." *Id.* at 1309–10 (quoting *United States v. Santa,* 236 F.3d 662, 667 (11th Cir.2000)) (alterations in original).

 The first factor weights heavily in this case. "If only a short period of time has passed, a court is more likely to consider the consent as a 'poisonous fruit' of the illegal act-that is, the consent is tainted" *Id.* No bright-line rule defines a short period of time, but our Circuit has referred to three minutes as "extremely short," and ten to twenty minutes as "a relatively brief period of time." *Id.* (citing *Santa,* 236 F.3d at 666–68 (two to three minutes), and *United States v. Chanthasouxat,* 342 F.3d 1271, 1280 (11th Cir.2003) (three minutes)). Here, the agents requested consent to search the bedroom mere moments after their initial unauthorized entry into the bedroom and, indeed, during their unauthorized presence there. Similarly, the search of the electrical devices occurred immediately after the second search of the bedroom.

The second factor, "the presence of intervening circumstances, or events that interrupt the causal connection between the illegal act and the possibly tainted consent," *id.* at 1311, also weighs heavily against the Government. A seamless sequence of events links the first unauthorized search and the second and third consent-based searches, and this Court finds no occurrence that impeded the chain of causation from beginning to end. The agents and Defendant remained inside the bedroom rather than, for example, talking downstairs, outside, in an agent's car, or in some other location. The agents did not stop to review Cordova's rights with him and execute a written consent form. *See id.* at 1311 (finding the review and signing of a consent form to be an intervening event). The verbal consent was itself brief and perfunctory: "I also asked him if it would be all right if I take—took a look around. He responded, sure, go ahead." Direct Exam of Officer Summers, Tr. at 126. Regardless of the sufficiency of that exchange for establishing voluntariness, it is insufficient as an intervening circumstance to remove the taint of the illegal search. The second consent to search the electrical devices also cannot be an intervening circumstance because no one even recalls receiving consent to search the electrical devices.

The final factor, purpose and flagrancy, also weighs against the government. The Magistrate Judge found that one of the agents entered with the sole purpose of protecting and seizing evidence, while another had both that motive and a further concern for officer safety. This latter motive supports a finding that, while the entry itself was unlawful, it was not for an entirely unlawful purpose. *See id.* at 1312 (noting distinction in this context between unlawful entry and unlawful purpose). As for flagrancy, the protective sweep appears to have been the minimum necessary

to secure the premises, and the agents did not brandish their weapons. Because this is a somewhat unsettled area of law, on these facts there is no reason to believe that the agents intended any flagrant violations of the law.

The Eleventh Circuit has noted, however, the one aspect of flagrancy is whether evidence found in the unauthorized search helps create consent for later searches: "If this had been a situation where [the defendant] was face to face with the incriminating evidence obtained by a prior illegal search and able to see that the police had firm control over her home, the consent may have been tainted." *Id.* at 1313 (internal quotation marks omitted). Cordova was standing in a room with several officers after the handgun had just been seized and it is unlikely that this fact did not weigh heavily on his mind as he granted consent for the subsequent searches. For this reason alone the Court finds that the third factor also leans against the Government.

Taking the three factors together, and evaluating the events taken as a whole, this Court concludes that the initial unauthorized search of the bedroom tainted Cordova's later consent to the search of his bedroom and electrical devices, and that therefore those searches were not authorized under the Fourth Amendment. Moreover, for reasons identical to those just explained, the second—unauthorized—search of the bedroom, which discovered the electrical devices, further tainted Cordova's consent to search the electrical devices.

Cordova's objection to the Magistrate Judge's recommendation to deny the Motion to Suppress is sustained as to the searches of March 26, 2009, the Magistrate Judge's recommendation is rejected, and the evidence seized during the searches of March 26, 2009, is ordered suppressed.

## B. *The Motion to Dismiss*

The Defendant further objects to the recommendation to deny his Motion to Dismiss the Indictment as a Violation of the Double Jeopardy Clause of the Fifth Amendment, which states:. "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb."

 Cordova first asserts that the indictment violates double jeopardy because it is based on the same conduct—the alleged robbery of a gas station convenience store—that formed the basis of his plea of guilty to charges of theft by receiving stolen property in Gwinnett County. Acknowledging that *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959), is binding authority on this Court and that it specifically authorizes, under the doctrine of "dual sovereignty," a federal prosecution for acts that a defendant has been convicted of in state court, Cordova nevertheless criticizes the doctrine and expresses optimism that the Supreme Court will someday reject the dual sovereignty doctrine. The Court is bound by precedent in this Circuit. *See id.* (authorizing federal prosecution after defendant was convicted in state court for the same acts).

 Defendant next argues that the dual sovereignty doctrine does not apply because of the "sham prosecution" exception, which the Supreme Court alluded to in *Bartkus v. Illinois,* 359 U.S. 121, 123–24, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). The *Bartkus* Court, though upholding a subsequent conviction in state court after acquittal in federal court for the same actions, noted that the record did "not sustain a conclusion that the state prosecution was a sham and a cover for a federal prosecution, and thereby in essential fact another federal prosecution." *Id.* at 124, 79 S.Ct. 676. Our Circuit has observed that some circuits have held that the above language in *Bartkus* supports a sham pros-

ecution exception. *United States v. Baptista–Rodriguez*, 17 F.3d 1354, 1361 (11th Cir.1994) (collecting cases from the Second, Fourth, Ninth, and District of Columbia Circuits). Under the exception "the defendant must show that one sovereign was so dominated, controlled, or manipulated by the actions of the other that it did not act of its own volition." *Id.*

 This Circuit has not yet decided the question whether there is a sham prosecution exception in our circuit. If such an exception exists, however, this Circuit has held that the defendant must show "that one sovereign controlled, dominated, or manipulated the *prosecution* of the defendant by the other." *Id.* at 1362. Investigation and apprehension by a separate sovereign does not trigger the exception. *See id.* In our Circuit an allegation that federal authorities controlled an investigation, rather than a prosecution, is insufficient to raise the sham prosecution exception, if there is one. *See Id.*; *see also Bartkus v. Illinois*, 359 U.S. at 122, 79 S.Ct. 676 (subsequent state prosecution, consisting solely of evidence gathered by federal authorities and including evidence gathered after initial acquittal in federal court, was not a sham prosecution).

 The Defendant has admitted that "Agent Tyler had no additional role in the Gwinnett County court case" after Defendant's initial non-custodial interrogation at the Gwinnett County police station. Defendant's Objections to R & R at 47. Defendant also does not allege that any federal authorities played any role at all, much less controlled, his Gwinnett County District Attorney's prosecution. He there-

fore has not adequately alleged the existence of a sham prosecution.

The Gwinnett County investigation of the armed robberies existed prior to any contact between Agent Tyler and Gwinnett County officials, Gwinnett County reached out to federal and local authorities for assistance and information, and, responding to the request, Agent Tyler provided assistance and information. Agent Tyler testified that he did not exercise any control over the investigation into the armed robberies, and that he acted only in a "support role." The fact that his interest in investigating local gang activity overlapped with Gwinnett County's interest in investigating local armed robberies and led to the sharing of information and evidence does not warrant an inference of manipulation or control.

Defendant's objection to the Magistrate Judge's recommendation to deny his motion to dismiss is therefore overruled and the portion of the R & R recommending denial of the Motion to Dismiss is adopted.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion to Suppress Evidence obtained during the searches of March 26, 2009, is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss the Indictment is **DENIED.**